## NATIONAL LABOR RELATIONS BOARD v. CARLISLE LUMBER CO.
### No. 8361.

Circuit Court of Appeals, Ninth Circuit.
Dec. 13, 1937.

WILBUR, Circuit Judge, dissenting.

Charles Fahy, Gen. Counsel, Robert B. Watts, Associate Gen. Counsel, A. Norman Somers, Senior Litigation Atty., and Philip Levy, Atty., National Labor Relations Board, all of Washington, D. C., for petitioner.

Theodore B. Bruener, of Aberdeen, Wash., and Charles H. Paul, of Seattle, Wash., for respondent Carlisle Lumber Co.

C. D. Cunningham, of Centralia, Wash., for Associated Employees of Onalaska, Inc.

Before WILBUR, HANEY, and STEPHENS, Circuit Judges.

HANEY, Circuit Judge.

The National Labor Relations Board has petitioned this court for the enforcement of an order made by it in a proceeding instituted against respondent.

On January 16, 1936, Local No. 2511 of the Lumber & Sawmill Workers Union, hereinafter called the union, filed a charge with a Regional Director appointed by the National Labor Relations Board, hereinafter referred to as the Board, pursuant to 29 U.S.C.A. § 160(b). On the same date, the Regional Director issued a complaint on behalf of the Board, as provided in 29 U.S.C. A. § 160(b), and gave notice of hearing.

The complaint charged that respondent had engaged, and was engaging in an unfair labor practice, as provided in 29 U.S. C.A. §§ 157, 158(1–3) and (5). These provisions are as follows:

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. A. § 157.

"It shall be an unfair labor practice for an employer— ,

"(1) To interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title.

"(2) To dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it. * * *

"(3) By discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization. * * *

"(5) To refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a)[1] of this title."

On January 23, 1936, respondent filed a bill of complaint in a United States District Court in which it sought to enjoin the Board from proceeding with the hearing on the complaint. That court entered an order dismissing the bill of complaint on March 24, 1936. Respondent thereupon appealed to this court and applied for an injunction pending such appeal. On March 31, 1936, this court denied the application (Carlisle Lumber Co. v. Hope; 9 Cir., 83 F. 2d 92), saying:[2] "We are not persuaded

---

[1] Section 159 (a), 29 U.S.C.A. provides: "Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment."

[2] On September 21, 1936, this court dismissed the appeal because respondent failed to comply with our rules regarding printing of record and filing briefs on appeals, 9 Cir., 85 F.2d 1010.

that irreparable injury would result to the appellant from the hearing before the Board where the order of the Board is without force until a hearing before a court and an order of the court based thereon."

Upon the announcement of that decision, respondent apparently abandoned its appeal.

On April 7, 1936, there was filed in the proceeding before the Board a motion for leave to intervene, and a petition in intervention by Associated Employees of Onalaska, Inc., hereinafter referred to as the company union. The petition prayed, among other things, that the company union be designated as the sole and exclusive collective bargaining unit for all employees of respondent.

The following day, on April 8, 1936, respondent filed its answer with the Board in which it denied that it had engaged in the unfair labor practices alleged, and admitted that since July 5, 1935, it had refused to bargain collectively with the union.

On April 7, 1936, hearings began. Before any testimony was taken, respondent moved to dismiss the complaint on the following grounds: (1) That neither respondent nor its employees were engaged in interstate commerce; that neither the logging nor the manufacturing operations of the respondent, nor the alleged unfair labor practices directly affected interstate commerce; that therefore the National Labor Relations Act, hereinafter called the act, did not apply to respondent; and (2) that the act violated article 1, § 8, article 3, §§ 1 and 2, of the Constitution, and the Fifth, Ninth, and Tenth Amendments thereto. The motion was denied. A like motion on the same grounds was made when the Board rested its case, and, when ruling thereon was reserved, such motion was renewed at the close of all the evidence. The motion was thereafter overruled. On September 26, 1936, the Board made its decision.

The Board found that respondent is a Washington corporation engaged in the general logging, sawmill and mill business, in the cutting of timber into logs, in the sawing and milling of logs into shingles and lumber, and in the sale and distribution of such products. All respondent's logging and milling operations are carried on within the state of Washington. The daily capacity of respondent's sawmill is over 250,-000 feet; the mill being one of the largest in the Pacific Northwest. The daily capac-ity of respondent's shingle mill is about 200,000.

Although respondent keeps a large inventory of lumber on hand, 80 per cent. of its daily production is milled and shipped in response to orders on hand. During the year 1934, respondent produced 38,-559,061 feet of lumber; the total sales of lumber and shingles for that year being approximately $700,000. During the year 1935, respondent produced 34,483,381 feet of lumber; its total sales of lumber and shingles being approximately $515,000.

Ninety per cent. of the lumber manufactured by respondent is shipped by it to points outside the state of Washington. Between the months of August, 1935, and February, 1936, a total of 861 carloads of lumber were shipped from respondent's plant. Of that number, 776 carloads were shipped to points within the United States and outside the state of Washington; 8 carloads were shipped to docks in the state of Washington for shipment to foreign countries; and 77 carloads were shipped to points within the state of Washington.

In all its operations the respondent employs, on the average, about 400 men, including its clerical and office staff of about 45.

About June, 1933, respondent's manager introduced among its employees a labor organization which we will call the 4 L's. At one time 251 of respondent's employees were members of the 4 L's. About February, 1934, a group of respondent's employees organized the union, which was affiliated with the American Federation of Labor. By December, 1934, more than 50 per cent. of respondent's employees were members of the union. The officers of the union then requested respondent to meet with such officers as the representatives of the majority of its employees. Respondent refused, and an election was held by the National Labor Relations Board, under the National Industrial Recovery Act, 48 Stat. 195, at the request of the officers. A majority of respondent's employees voted. Of the 206 ballots, 191 were cast, for the union as representatives of the employees, 12 for the 4 L's, and 3 were declared void.

Between the time of the election and May 1, 1935, several attempts were made by officers of the union to bargain with respondent. Some meetings were held, and the demands of the union were presented to an officer of respondent, who either refused the demands, or stated that nothing could

be done in the absence of respondent's president and general manager.

On May 1, 1935, a meeting was held in regard to an agreement proposed by a convention of members in the American Federation of Labor. The convention had agreed that in the event the employers refused to sign the agreement a strike was to be called. At the conclusion of that meeting the union's demands were refused.

The Board found that the union was sincere in the foregoing efforts to bargain. With respect to respondent it said: " * * The respondent, however, did not prefer to settle its differences with the union, nor did it have at any time a sincere intention of settling its differences or of perfecting an agreement with the union. Even though the respondent through its officers met with the union at various times, the meetings were not attended by such officers with a sincerity of purpose, but rather with a desire to conceal the respondent's actual refusal to bargain. * * *"

From the time of the election, the union's membership increased, so that by May 1, 1935, the membership in the union was 263. The Board found: "That these 263 members of the union had designated the union as their representative for the purposes of collective bargaining in that unit is not questioned."

On May 3, 1935, the number of respondent's employees was 344, which did not include any of respondent's "shingle mill employees nor any other of its employees who had been temporarily laid off during the latter part of April, 1935." The number of workmen referred to in the quoted language is not disclosed. Of the 344 employees, 263 went on strike on May 3, 1935. On the following day the secretary of the union wrote respondent that: "At any time you may wish to confer you will please notify the union hall as the men on picket duty are not alowed [allowed] to conver [confer] with anyone connected with the" respondent. Respondent notified the union that its operations had closed down indefinitely, and therefore there was nothing about which to negotiate with the union.

On May 6, 1935, respondent posted a notice as follows:

"Last Friday morning at 10:00 A. M. a small minority of our employees walked off the job, quit their jobs, intimidating the other employees and shut down our operations.

"We were never served with a strike notice; but the demands of the minority, by press reports, to obtain wages and conditions which are impossible for us to meet, after many years of heavy losses, make it necessary to close down all departments indefinitely effective today.

"Those not employed desiring to remain in our houses may do so by paying the regular rent monthly in advance. Notify the timekeeper of your desire and consider this notice legal notice to vacate the house you are occupying."

On June 25, 1935, respondent posted the following notice:

"We have closed our payrolls which automatically discharges all of our former employees, excepting those now employed.

"Statements and checks for balances due will be mailed shortly after closing of books, June 30th."

On July 5, 1935, the act became effective. The following day the secretary of the union wrote respondent:

"Due to the fact that the Wagner Bill has been passed by the House of Congress, and signed by the President, we feel that a settlement of differences can be brought about by arbitration.

"The [union] is ready and willing to meet with you for the purpose of arbitration, at any time it is convenient for you."

On July 8, 1935, respondent replied: "As previously advised by public notice, our properties have been closed indefinitely, all our former employees discharged, hence we have no differences to arbitrate."

On July 29, 1935 respondent posted a notice, stating that it had been approached by a committee representing a large number of its former employees, urging the company to resume operations, and that application cards had been signed by more than 260 men; that: "The opportunity is hereby given for all former employees to sign application cards on the same basis and conditions by July 31st, after which date unfilled jobs will be assigned to other applicants." By the terms of the application card, the employee agreed: "To renounce any and all affiliation with any labor organization." No one was employed prior to August 5, 1935, unless he signed an application card containing the quoted provision. On August 5, 1935, respond-

ent resumed operations with 109 old employees, of whom 22 were former members of the union, and 65 new employees. The record does not disclose that respondent has since resumed operations with a full force of men.

Shortly after the resumption of activities the company union was formed. Respondent gave the company union free hall rent; collected dues and assessments from the members on behalf of the company union; distributed notice of elections to members in pay envelopes; furnished publicity matter to be used by the company union; permitted the use of its mimeograph machine by the company union without charge; and permitted the use of its bulletin board by the association without charge.

The Board concluded that the refusal to bargain with the union was an unfair labor practice as provided in 29 U.S.C.A. § 158(5); that respondent's offer of employment, conditioned upon an application containing the provision that employees must "renounce any and all affiliation with any labor organization," was an unfair labor practice within 29 U.S.C.A. § 158(3); that respondent had dominated and interfered with the formation and administration of the company union, and had contributed support to it, which was an unfair labor practice as provided in 29 U.S.C.A. § 158(2); that all the foregoing acts were an unfair labor practice as provided in 29 U.S.C.A. § 158(1); that the union "has at all times since July 5, 1935 been the exclusive representative of all the employees in such unit for the purposes of collective bargaining."

The Board ordered respondent to cease and desist from the foregoing unfair labor practices, including a provision that it cease and desist from refusing to bargain collectively with the union. It ordered respondent to take affirmative action, including the following: (1) Offer reinstatement to its employees who were employed on May 3, 1935, whose positions are now held by persons employed for the first time on July 8, 1935, and place all other employees who were employed on May 3, 1935, on a list to be offered employment if and when their labor is needed before any new employees are hired, the employees to be reinstated and those to be listed, to be only those who have not, since May 3, 1935, received regular and substantially equivalent employment elsewhere; (2) "make whole its employees who were employed on May 3, 1935, who struck on that date or

thereafter, and who were members of the union on July 29, 1935, the day of the respondent's first act of discrimination against all of the members of the union, for any losses of pay they have suffered by reason of such discrimination, by payment to each of them a sum equal to that which they each would normally have earned as wages during the period from July 29, 1935 to the date of respondent's offer of reinstatement, less the amount earned by each of them during such period"; (3) bargain collectively with the union at its request; and (4) withdraw all recognition from the company union.

On October 19, 1936, the Board filed its petition for the enforcement of its order in this court. It was heard by three judges of this court on May 5, 1937. Thereafter, one of the judges, believing himself disqualified, withdrew from participation, and it was reargued on September 15, 1937.

Respondent questions the sufficiency of the finding that the union was selected as the representative of a majority of respondent's employees. It contends that the election in December of 1934 cannot be relied upon because the total number of employees at that time was 416, and that inasmuch as the union was selected by only 191 employees, it was not designated by a majority of respondent's employees. The officer in charge of that election selected as a unit, respondent's sawmill, shingle mill, yard, pond, and logging operations. He excluded 17 foremen, 8 clerical employees, and 30 Japanese, a total of 56, leaving as a unit 360 employees. The Board decided in this case that the unit so selected was proper, under 29 U.S.C.A. § 159(b). Since it does not appear to be arbitrary, we must affirm that decision. Therefore, the union was designated as the agent of the employees by a majority of respondent's employees in a unit appropriate for such purposes.

Respondent also contends that there is no evidence to sustain the finding that the union had been designated as the representative of the employees by a majority of the employees on July 5, 1935, and subsequently; that "the fact that a majority of the employees of respondent may have been members of the union on July 5 and subsequently does not of itself prove that representatives were designated or selected for the purposes of collective bargaining by the majority of the employees." Here the evidence shows that the union was des-

ignated as the representative in December, 1934, and from that time to May 3, 1935, membership in the union increased. We believe the Board could properly infer that the union had been designated as the representative by a majority of the employees.

The company union questions the finding that respondent was guilty of an unfair labor practice as provided in 29 U. S.C.A. § 158(2), which provides that it is an unfair labor practice for an employer "to dominate or interfere with the formation or administration of any labor organization or contribute financial or any other support to it." It is sufficient to say that the acts of respondent, in giving the free services enumerated, came within the statute. Inasmuch as all the Board's findings are sustained by substantial evidence, we must sustain them. National Labor Board v. Jones & Laughlin Steel Corporation, 301 U.S. 1, 29, 57 S.Ct. 615, 620, 81 L.Ed. 893, 108 A.L.R. 1352; National Labor Board v. Fruehauf Co., 301 U.S. 49, 57, 57 S.Ct. 642, 644, 81 L.Ed. 918, 108 A.L.R. 1352; National Labor Board v. Clothing Co., 301 U.S. 58, 75, 57 S.Ct. 645, 647, 81 L.Ed. 921, 108 A.L.R. 1352.

The company union asks this court to order the Board to take further evidence so that it may be permitted to introduce into evidence a contract it made with respondent covering wages, hours of employment, and living conditions of respondent's employees, and "to introduce in evidence such other facts as are relevant and pertinent to the inquiry." The contract mentioned was made subsequent to April 7, 1936. 29 U.S.C.A. § 160(e) provides, after petition for enforcement of an order has been made, that: "If either party shall apply to the court for leave to adduce additional evidence and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the hearing before the Board, * * * the court may order such additional evidence to be taken before the Board."

In the absence of a showing that "such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the hearing," the request must be denied.

Respondent contends that the act is not applicable to it, because there is "no antecedent import of raw materials entering into" its manufacturing operations.

In National Labor Board v. Jones & Laughlin Steel Corporation, supra, 301 U. S. 1, 31, 57 S.Ct. 615, 621, 81 L.Ed. 893, 108 A.L.R. 1352, it is said that the terms of the act purport "to reach only what may be deemed to burden or obstruct that commerce. * * * It is a familiar principle that acts which directly burden or obstruct interstate or foreign commerce, or its free flow, are within the reach of the congressional power. * * * It is the effect upon commerce, not the source of the injury, which is the criterion." Considering the effect of the industrial strife, it is plain to be seen that the stoppage of respondent's operations caused by the unfair labor practices prevents 90 per cent. of respondent's product from entering interstate commerce, which is nothing more nor less than obstructing the whole interstate and foreign commerce to that extent. The effect is, therefore, direct and immediate, is within the control of Congress, and therefore respondent is subject to the act.

Independently of the foregoing, respondent's contention was decided adversely by this court in Edwards v. United States, 9 Cir., 91 F.2d 767, 780, and in National Labor Board v. Santa Cruz Fruit Packing Co., 9 Cir., 91 F.2d 790, 792, certiorari granted December 6, 1937, 58 S.Ct. 282, 82 L.Ed. ——, in each of which it was held that Carter v. Carter Coal Co., 298 U. S. 238, 56 S.Ct. 855, 80 L.Ed. 1160, relied on by respondent as supporting its contention, was overruled by National Labor Board v. Jones & Laughlin Corporation, supra.

Respondent contends that the strike of May 3, 1935, terminated the relation of employer and employee. We believe that in the absence of statute the relationship of employer and employee is not completely terminated by a strike, but that a new status arises. The courts have coined a word to describe the situation and have called an employee on strike a "striking employee." Jeffery-De Witt Insulator Co. v. National L. R. Board, 4 Cir., 91 F. 2d 134, 137, and cases cited. Of course, under the act a "striking employee" is considered an employee. 29 U.S.C.A. § 152 (3). This court has not held to the contrary in National Labor Relations Board v. Mackay Radio & Tel. Co., 9 Cir., 87 F.2d 611, 631, 632, opinion on rehearing dated October 19, 1937, 9 Cir., 92 F.2d 761. The concurring result announced by two of the three sitting judges therein was reached by

entirely different reasoning and laid down no rule of law which is controlling here.

Respondent also contends that it had discharged all employees on June 25, 1935, prior to the effective date of the act, and that it had the unquestioned common-law right so to do, and therefore it had no employees when the act became effective. If this contention is sound, there would, of course, be no unfair labor practices.

The act defines "employee" to "include * * * any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment." 29 U.S.C.A. § 152(3). The act also defines "labor dispute" to include "any controversy concerning terms, tenure or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether the disputants stand in the proximate relation of employer and employee." 29 U.S.C.A. § 152(9).

It is clear here, that at the time of the unfair labor practices, there was a current labor dispute, in that there was a controversy existing as defined above. It is likewise clear that the individuals, that is, the union employees, ceased their work in order to sustain their position in the controversy. Under the act, therefore, the union members were "employees."

Respondent argues that we thus construe the statute retroactively. In Shwab v. Doyle, 258 U.S. 529, 534, 42 S.Ct. 391, 392, 66 L.Ed. 747, 26 A.L.R. 1454, it is said: "The initial admonition is that laws are not to be considered as applying to cases which arose before their passage unless that intention be clearly declared."

See, also, White v. United States, 191 U.S. 545, 552, 24 S.Ct. 171, 48 L.Ed. 295; United States v. Magnolia Co., 276 U.S. 160, 162, 48 S.Ct. 236, 237, 72 L.Ed. 509; Brewster v. Gage, 280 U.S. 327, 337, 50 S. Ct. 115, 117, 74 L.Ed. 457.

It would be a sufficient answer to say, we believe, that the intention seems to be plainly expressed. However, a better answer is that we are not applying the statute retroactively. For instance, it is alleged that on July 8, 1935, respondent committed an unfair labor practice by refusing to bargain collectively with the representative of its employees. It is admitted that respondent refused to bargain collectively with the union, which we have held is the representative designated by a majority of the employees, on July 8, 1937. On that date, respondent had employees, for the union men had ceased work as a consequence of a current labor dispute. In other words, we consider only the facts existing at the time of the labor dispute. Cf. Jeffery-De Witt Insulator Co. v. National L. R. Board, supra, 4 Cir., 91 F.2d 134, 139.

There is no limitation in the statute that individuals whose work has ceased as a consequence of a current labor dispute are employees only if they were not discharged prior to the effective date of the act. The reading into the statute of such a limitation would constitute an abuse of power.

 In connection with the foregoing, we should discuss the power of Congress to legislate that an employee who has been discharged must be considered as an employee in determining whether an employer has been guilty of unfair labor practices. Respondent asserts that prior to the effective date of the act "an employer had the unquestioned common law right to discharge its employees, either singly or collectively, at will."

In considering this question we must apply the rules stated in National Labor Board v. Jones & Laughlin Steel Corporation, supra, 301 U.S. 1, 30, 57 S.Ct. 615, 621, 81 L.Ed. 893, 108 A.L.R. 1352, as follows: "The cardinal principle of statutory construction is to save and not to destroy. We have repeatedly held that as between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, our plain duty is to adopt that which will save the act. Even to avoid a serious doubt the rule is the same."

It was also said in that case, supra, 301 U.S. 1, 36, 57 S.Ct. 615, 624, 81 L.Ed. 893, 108 A.L.R. 1352: "The fundamental principle is that the power to regulate commerce is the power to enact 'all appropriate legislation' for its 'protection or advancement;' * * * to adopt measures 'to promote its growth and insure its safety;' * * * 'to foster, protect, control, and restrain.' * * * That power is plenary and may be exerted to protect interstate commerce 'no matter what the source of the dangers which threaten it.'"

Thus the right of discharge claimed by respondent is not absolute. It is subject to

the limitations that the Congress may prescribe, if it regulates, burdens, or obstructs interstate commerce. Therefore, Congress has not destroyed any vested right of respondent, but has merely exercised its right to legislate in respect to a right, over which, because of prior nonaction by Congress, respondent believed it had complete control. Congress took nothing from respondent, for respondent has now as much right as it ever had; that is, the right of discharge, so long as it did not regulate, control, interfere with, burden, or obstruct interstate commerce.

In Re Debs, 158 U.S. 564, 581, 15 S.Ct. 900, 905, 39 L.Ed. 1092 it was said: "It is curious to note the fact that, in a large proportion of the cases in respect to interstate commerce brought to this court, the question presented was of the validity of state legislation in its bearings upon interstate commerce, and the uniform course of decision has been to declare that it is not within the competency of a state to legislate in such a manner as to obstruct interstate commerce. If a state, with its recognized powers of sovereignty, is impotent to obstruct interstate commerce, can it be that any mere voluntary association of individuals within the limits of that state has a power which the state itself does not possess?"

In Addyston Pipe & Steel Co. v. United States, 175 U.S. 211, 230, 20 S.Ct. 96, 103, 44 L.Ed. 136, the court quoted the above language from In re Debs, supra, and then said: "What sound reason can be given why Congress should have the power to interfere in the case of the state, and yet have none in the case of the individual? Commerce is the important subject of consideration, and anything which directly obstructs and thus regulates that commerce which is carried on among the states, whether it is state legislation or private contracts between individuals or corporations, should be subject to the power of Congress in the regulation of that commerce."

Finally, although the precise point in question was not considered in National Labor Board v. Jones & Laughlin Steel Corporation, supra; National Labor Board v. Fruehauf Co., supra; National Labor Board v. Clothing Co., supra; and Associated Press v. Labor Board, 301 U.S. 103, 57 S.Ct. 650, 81 L.Ed. 953, because the alleged rights were different from the one here involved, yet, by reason of analogy, all those cases definitely, we believe, settle the question herein determined.

Respondent contends that the proceeding before us is an equitable proceeding; that the union's picketing resulted in violence, as the Board found, which was a violation of the laws of Washington, and therefore enforcement should be denied for the reason that the union has not come into the court with clean hands. It is not the union, but the Board, which is asking enforcement.

Respondent also contends that the order of the Board requiring payment for time lost is capricious and arbitrary. The act authorizes the Board to make such an order, 29 U.S.C.A. § 160(c), and the provision in the act is constitutional. National Labor Board v. Jones & Laughlin Steel Corporation, supra, 301 U.S. 1, 47 et seq., 57 S.Ct. 615, 81 L.Ed. 893, 108 A. L.R. 1352.

Finally, respondent objects to the part of the order of the Board requiring the payment of back pay.

Under the act the Board is empowered to order "reinstatement of employees with or without back pay." 29 U.S.C.A. § 160 (c). This necessarily implies that the Board shall have power to determine the amount of back pay, if any there should be, awarded to the employees involved. Nothing in the act empowers this court to make such findings, and the record does not disclose facts upon which the court could act if it had the power to do so.

Ordinarily we would not consider these questions because they were not raised before the Board. 29 U.S.C.A. § 160(e).

A situation much like that presented in the instant case confronted this court in National Labor Board v. Pacific Greyhound Lines, 9 Cir., 91 F.2d 458, 460, where the Board ordered back pay, but did not specify the amount thereof, this court said: "No objection is raised to the form of the order on this account but before the enforcement order is issued by this court this amount should be supplied and included in the order. * * * If the parties cannot agree within ten days upon the amount to be included in the enforcement order, or to be paid, appropriate steps will be taken for its determination before the order is made."

There are factual differences between National Labor Board v. Pacific Greyhound Lines, supra, and the instant case. There the employees were few, the wage problem was simple, and there was nothing to indicate an inability to promptly agree upon such details. Here the employees are many; the wage problem is so full of difficulties that it seems probable that it will have to be solved by an authoritative tribunal. This is not said for the purpose of precluding agreement between the parties. On the other hand, we earnestly encourage it. It may be that we have the implied power, it certainly is not express in the act, to order the Board to proceed with this issue of the case, but we prefer to follow the course specifically provided for in the act. We refer to the following, which we quote from section 160(e) of the act: "If either party shall apply to the court for leave to adduce additional evidence and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the hearing before the Board, its member, agent, or agency, the court may order such additional evidence to be taken before the Board, its member, agent, or agency, and to be made a part of the transcript. The Board may modify its findings as to the facts, or make new findings, by reason of additional evidence so taken and filed, and it shall file such modified or new findings, which, if supported by evidence, shall be conclusive, and shall file its recommendations, if any, for the modification or setting aside of its original order."

Enforcement of the order herein in all of its provisions except those requiring back pay is hereby granted, effective immediately.

With respect to that portion of the order directing back pay to be made by the company to the employees, we withhold our ruling for a period of twenty days.

If within such time either party shall apply to us pursuant to the terms of 160(c), supra, for leave to adduce additional evidence before the Board for the purpose of determining the wage issue and identifying the persons to whom such wages, if any, are due, together with the amounts due to such several persons, we will determine therefrom whether such additional evidence is material, and whether there were reasonable grounds for failure to adduce it at the hearings heretofore had by the Board.

Should such application be granted, a reasonable time will be allowed within which the Board may, upon hearings before it or a member, agent, or agency, designated by the Board, determine the names of the persons, if any, to whom wages are due, together with the amounts, if any, due to each, including time within which the Board may certify such evidence together with its findings and order thereon to us.

STEPHENS, Circuit Judge (concurring).

It has been very earnestly and ably argued by counsel for respondent that the Board is attempting to apply the Wagner Act, 29 U.S.C.A. § 151 et seq., retroactively when it classes discharged workmen as employees under the act.

In my judgment the main opinion properly decides this question against respondent's contention. Every act complained of happened after the statute went into effect, and every phase of the Board's order is premised upon such. And, surely, there was ample evidence before the Board to sustain its findings that the strike was current when these acts were performed.

The gist of respondent's argument is that workmen who were on strike and had been discharged because of striking, prior to the effective date of the Wagner Act, were strangers to respondent, and that there was no warrant in law for considering them at all in the controversy; that to do so was applying the act retroactively.

But long before the passage of this act the contest for advantage between capital and labor demonstrated that employees on strike were not strangers to employers.

The courts became cognizant of changes in our industrial system and have in numerous cases noted it. Courts began to hold that it was no longer true that the only right the dissatisfied workmen had, in any combination of circumstances, was to quit the service. Imagine the wreckage that would ensue if all of the employees of a great manufacturing industry were to doff their aprons over some requirement not to their liking and start out independently to look for other jobs. Commerce in such an industry would be out of balance and whole cities of families would be on the move scattering hither and thither, seeking work in the industry with which

they were familiar. The holding in the Jeffery[1] opinion that "striking employees" is a name that denotes a status is only the latest judicial recognition of a commonly known fact. And this fact existed long prior to the Congress's declaration in the Wagner Act defining employees. If this status can be completely negatived by the simple method of discharging the men and hiring them over again on the employers' terms through the workers' necessities, then the efforts of the courts to move abreast of economic changes in this particular has failed. Here this court is asked to do this very thing.

Chief Justice Hughes uses apt language in the Jones & Laughlin Case, 301 U.S. 1, 57 S.Ct. 615, 626, 81 L.Ed. 893, 108 A.L.R. 1352, though applying it to a different set of facts, when he says: "We are asked to shut our eyes to the plainest facts of our national life and to deal with the question of direct and indirect effects is an intellectual vacuum." Under this doctrine, there never would have been a common law to guide the courts. The true common law, in its last analysis, is not something that grew to maturity in England and turned to an indestructible, unchanging thing, by whose tenets we are forever bound unless specifically relieved therefrom by statute, but is something that grows and changes to fit the customs and habits of every generation of people. This is not a novel idea, but has been the subject of much judicial comment. The subject is exhaustively treated in Hurtado v. California, 1884, 110 U.S. 516, 530, 4 S.Ct. 111, 292, 28 L.Ed. 232, and in Katz v. Walkinshaw, 1903, 141 Cal. 116, 123, 70 P. 663, 74 P. 766, 64 L.R. A. 236, 99 Am.St.Rep. 35.

Judge Garrecht, in his dissenting opinion in National Labor Relations Board v. Mackay Radio & Telegraph Company, 9 Cir., 1937, 92 F.2d 761, 767, admirably treats a similar situation from the standpoint of the status of the striking employees as follows:

"Because employment is a matter of contract, it is said, to compel the hiring of a man who has ceased work for reasons other than an unfair labor practice is to compel the making of a new contract.

"The argument overlooks the fact that the relationship of employer and employee, while initiated by contract, is a status the incidents of which may be altered by the Legislature under its police power. In the field of interstate commerce it is the Congress which exercises this police power.

"Examples of relationships originating in contract whose incidents are subject to legislative alteration are numerous.

"The status of seaman and vessel, resting in and originated by contract, may be modified by Congress to the extent (to cite one example among many) of prohibiting the payment of wages in advance. Patterson v. The Eudora, 190 U.S. 169, 175, 23 S.Ct. 821, 47 L.Ed. 1002. The status initiated by the contract of employer and employee in an industry subject to state regulation may be altered by abolishing the employee's right to sue for injuries and substituting therefor a system of workmen's compensation. New York Central R. Co. v. White, 243 U.S. 188, 206, 37 S.Ct. 247, 61 L.Ed. 667, L.R.A.1917D, 1, Ann. Cas.1917D, 629; Chicago, B. & Q. R. Co. v. McGuire, 219 U.S. 549, 571, 31 S.Ct. 259, 55 L.Ed. 328. Likewise, in an interstate commerce industry, Congress may alter the status of the employment relationship by abrogating certain of the common-law defenses of an employer against suit for damages brought by an employee. Mondou v. N. Y., etc., R. Co., 223 U.S. 1, 32 S.Ct. 169, 56 L.Ed. 327, 38 L.R.A.(N.S.) 44.

Congress has written this change in statute law, and, since this law has withstood the constitutional test, it follows that the change as to the status of employees on strike as pronounced by courts collides with no constitutional barrier.

In my opinion the situation existing in the lumber mill town, the seat of the present controversy, is a typical instance of the necessity for the modification of the usual effect of a discharge during and because of a labor dispute. The congressional mind was cognizant of the status of striking employees and did not regard them as strangers to the employer, which in fact they were not. In this view of the matter, no question of retrospective operation of the act is present.

---

[1] Jeffery-De Witt Insulator Co. v. National L. R. B., 4 Cir., 1937, 91 F.2d 134, containing collation of authorities. It is not true that all cases supporting this decision arise from statutory enactment. When paralleled with the instant case, it is practically upon all fours with it. There is present in each case the element of discharge through affirmative action of the employer.

WILBUR, Circuit Judge (dissenting).

The National Labor Relations Board has petitioned this court for an order to enforce its conclusions and order made in its decision of September 26, 1936. The Wagner Act became effective July 5, 1935, 29 U.S.C.A. § 151, et seq. The respondent, throughout the hearing before the Board, challenged the validity of the act as unconstitutional. After the briefs were filed, but before the oral argument, the Supreme Court passed upon National Labor Relations Board v. Jones & Laughlin Steel Corporation, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352, and companion cases, National Labor Relations Board v. Fruehauf Trailer Co., 301 U.S. 49, 57 S.Ct. 642, 81 L.Ed. 918, 108 A.L.R. 1352; National Labor Relations Board v. Friedman-Harry Marks Clothing Co., Inc., 301 U.S. 58, 57 S. Ct. 645, 81 L.Ed. 921, 108 A.L.R. 1352; Washington, Virginia & Maryland Coach Co. v. National Labor Relations Board, 301 U.S. 142, 57 S.Ct. 648, 81 L.Ed. 965, and Associated Press v. National Labor Relations Board, 301 U.S. 103, 57 S.Ct. 650, 81 L.Ed. 953, arising under the Wagner Act, and disposed of many of the arguments advanced by the respondent in support of its contention that the act was unconstitutional. In view of these decisions an additional brief was filed by each party to the proceedings, including the intervener Associated Employees of Onalaska, Inc., wherein the attack upon the act as unconstitutional is abandoned. However, the respondent still contends that the act is not applicable to the activities conducted by it because they do not constitute interstate or foreign commerce and do not directly affect the same.

It is not questioned that between 90 and 95 per cent. of the lumber products resulting from a lumbering, transportation, and milling industry conducted by the respondent enter into interstate and foreign commerce. While the situation is analogous to the Carter Coal Case, 298 U.S. 238, 56 S.Ct. 855, 80 L.Ed. 1160, because in both cases it is a local product (lumber in the instant case and coal in the Carter Case) which is manufactured and shipped in interstate commerce, it is clear that although the activities of the respondent do not of themselves constitute interstate commerce (Coe v. Errol, 116 U.S. 517, 6 S.Ct. 475, 29 L.Ed. 715; Arkadelphia M. Co. v. St. Louis S. W. Ry. Co., 249 U.S. 134, 39 S.Ct.

237, 63 L.Ed. 517), the activities and business in which the respondent is engaged directly affects interstate commerce within the meaning of the Labor Relations Act, as interpreted and applied by the above-mentioned recent decisions of the Supreme Court.

Most of the matters involved in this proceeding occurred before the passage of the National Labor Relations Act, 29 U.S.C.A. § 151, et seq. While the Board does not claim that the act is retroactive, its findings cover with great detail the relations of the respondent and its employees previous to a strike which was called on May 3, 1935, and thereafter, both prior and subsequent to the effective date of the Wagner Act (July 5, 1935). These facts found by the Board may be briefly summarized as follows:

The company at all times had recognized as a collective bargaining unit an organization of employees known as the Four L's, (Loyal Legion of Loggers and Lumbermen). Some of respondent's employees had also joined the Lumber and Sawmill Workers Union, hereinafter referred to as the "union," affiliated with the American Federation of Labor. The respondent consistently declined to bargain with the union, except as hereinafter stated, contending that a majority of its employees were members of the 4 L's. The union contended that more than a majority of the employees had become members of the union and that it was entitled by reason thereof to bargain collectively with the employer. This right being consistently denied, the question was presented to the Old National Labor Relations Board set up by the President's program under the National Industrial Recovery Act, and it was there decided, after a vote of respondent's employees, that the union had a majority of membership and was entitled to bargain collectively with the respondent. It is not contended by the Board that this decision has any force or effect other than its evidentiary value as tending to show that the union was the body which represented the majority of respondent's employees and with which, under the Wagner Act, when it became effective, the employer was required to bargain.

Although the Board found that the Carlisle Lumber Company had consistently refused to recognize and bargain collectively with the union, it found that on January 23,

1935, W. A. Carlisle, the president, because of his absence, suggested that the union present its plan for a proposed working agreement to K. L. Carlisle, vice president and assistant manager; that in consequence, a meeting was arranged the latter part of January, 1935, with a committee representing the union and the vice president and assistant manager of the respondent, when the latter stated to the committee that he had no authority to act upon anything that might come up; that the terms of the proposed working agreement were discussed in great detail by the parties; that the proposed agreement provided for a minimum wage scale of 50 cents per hour for a 6-hour day, and a recognition by the respondent of the union as the exclusive collective bargaining agency for all respondent's employees; that the assistant manager rejected the proposal stating that it was unfair to the respondent, and that respondent could not agree to sever its relations with the 4 L's organization; that on April 8, 1935 the union requested a meeting with the officers of the respondent in order to discuss the discharge of Poore, an employee; that such a meeting was held but nothing was accomplished with respect to Poore's reinstatement; that in March, 1935, a committee of the union met with Kenneth Carlisle to discuss certain grievances with the union; that in March, 1935, the union requested a meeting with respondent to discuss the terms of a new agreement proposed by a convention of the American Federation of Labor; that this meeting was not held until May 1, 1935, when the union representatives met the respondent; that after a lengthy discussion of the provisions of the proposed agreement with respect to the minimum wage, 6-hour day, and withdrawal of recognition of the 4 L's as a bargaining agency, the assistant manager stated that there was nothing in the proposed agreement that pleased him; that the respondent would never sever its connection with the 4 L's; that as far as respondent was concerned the 4 L's would be the only organization dealt with.

We have thus a number of instances in which the respondent met with the committee of the union for the purpose of discussing the propositions advanced by the union. This is collective bargaining per se. The Board, however, found that these meetings were not "attended by such officers with a sincerity of purpose but rather with a desire to conceal the respondent's actual refusal to bargain." In view of the importance of the finding of the Board in this regard I place the same in the footnote.[1]

By this finding the Board has injected into the problem of collective bargaining an assumption which is not tenable. The law does not purport to require that the collective bargaining shall result in an agreement. National Labor Relations Board v. Jones & Laughlin Steel Corporation, 301 U. S. 1, 57 S.Ct. 615, 628, par. 16, 81 L.Ed. 893, 108 A.L.R. 1352, supra. It does require and seeks to establish the right of the employees to bargain through their chosen representatives, and if an agreement is arrived at, to "make a collective contract." When the employer has met these representatives and listened to their proposition, the employer is not required to make counter proposals. A refusal to make such propo-

---

[1] "The aforementioned unsuccessful attempts to meet with and bargain collectively with the respondent were motivated by a sincere desire on the part of the union to arrive at an agreement with the respondent respecting the union's demands.* The respondent, however, did not prefer to settle its differences with the union, nor did it have at any time a sincere intention of settling its differences or of perfecting an agreement with the union. Even though the respondent, through its officers, met with the union at various times, the meetings were not attended by such officers with a sincerity of purpose, but rather with a desire to conceal the respondent's actual refusal to bargain. The respondent has not made any efforts to justify the foregoing refusals to meet with the union to settle its differences and to arrive at an agreement.

"It claims only that the union did not represent a majority of its employees.

"The respondent cannot contend as it does that the union did not represent a majority of its employees and that therefore it was justified in not dealing with the union."

* "In addition to demanding a six-hour day, a minimum wage of 50 cents per hour, and that it be recognized and dealt with as the exclusive collective bargaining agency of all of the respondent's employees, the union was asking for reductions in rents on 'company houses', reduction in the rate charged for electricity, and use of the respondent's bulletin boards, which had always been used by the 4 L's."

sals or to accept the proposed agreement is clearly the constitutional right of the employer and is fully recognized by the Supreme Court in the Jones & Laughlin Steel Corporation Case, supra, if made as a result of or after meeting the representatives of the employees. Although the Board has covered this question in detail in the findings, it is unnecessary to pursue this subject further for the reason that the Board concedes that the Wagner Act was not operative upon these failures to reach an agreement by collective bargaining.

The strike occurred May 3, 1935. Previously it had been the announced intention of the workers to strike on May 6th. To forestall this strike the Board finds that the respondent declared a lockout on May 5th, whereupon the union struck on May 3d. One of the purposes of the strike was to secure recognition of the union as the bargaining unit of all the respondent's employees; the other was to secure the adoption of the agreement proposed as a result of the convention of the A. F. of L. After the strike the respondent consistently refused to recognize or deal with the union and on June 25, 1935, notified all its employees that their employment had terminated and that they would be paid off accordingly. They were paid and respondent contends that this terminated all semblance of employment. In pursuance of its announced intention respondent's activities thereupon entirely ceased. This was the situation at the time the Wagner Labor Relations Act became effective (July 5, 1935). The only employees then engaged were a few caretakers to prevent fire, etc. These were all members of the 4 L's and none of the union. On and after July 5, 1935, the union engaged in picketing the premises of the respondent, and, by reason of the persistent refusal of the respondent to engage in collective bargaining with it, continued to do so.

The Board found that the refusal of the respondent to bargain with the representatives of the union on July 29, 1935, after the Wagner Act went into effect, was an unfair labor practice within the meaning of the act. Respondent, on the other hand, contends that the members of the union were no longer employees and could not be made so by congressional definition after that relation had ceased in fact. At any rate, it is clear and is conceded that the conduct of the respondent after the Wag-

ner Act became effective is the only basis for the claim and finding of unfair labor practices.

### Were the Members of the Union Employees When the Wagner Act Became Effective?

The members of the union struck on May 3, 1935. Their condition as striking employees is one recognized by the law. Such employees are not performing the obligations of their employment and yet they are recognized as having a peculiar relationship to the employer during the strike. Their legal situation is not the same as though the employees had individually ceased to work. The decisions of the courts have frequently recognized this situation. Jeffery-DeWitt Insulator Co. v. National L. R. B., 4 Cir., June 16, 1937, 91 F.2d 134, 138, and cases cited. Congress has incorporated in the Wagner Act this idea by its definition of "employee" contained in the act. The term "employee" includes any individual "whose work has ceased as a consequence of, or in connection with, any current labor dispute, or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment." Wagner Act, § 2 (3), 29 U.S.C.A. § 152(3). The term "labor dispute" is also defined in the act, section 2(9), 29 U.S.C.A. § 152(9), to include any controversy concerning terms "tenure," or "conditions of employment," or "bargaining unit."

In the absence of any constitutional inhibition Congress can define the word "employee" for legislative purposes in any way that it sees fit. As stated by the Supreme Court in Carter v. Carter Coal Co., 298 U. S. 238, 289, 56 S.Ct. 855, 863, 80 L.Ed. 1160: "While the lawmaker is entirely free to ignore the ordinary meanings of words and make definitions of his own, Karnuth v. United States, 279 U.S. 231, 242, 49 S.Ct. 274, 73 L.Ed. 677; Tyler v. United States, 281 U.S. 497, 502, 50 S.Ct. 356, 74 L.Ed. 991, 69 A.L.R. 758, that device may not be employed so as to change the nature of the acts or things to which the words are applied."

See, also, cases involving such constitutional limitations; Employers' Liability Corporation v. Industrial Accident Commission, 179 Cal. 432, 177 P. 273; Perry v. Ind. Acc. Comm., 180 Cal. 497, 181 P. 788; Flickenger v. Ind. Acc. Comm., 181 Cal. 425, 184 P. 851, 19 A.L.R. 1150; Worswick

St. Paving Co. v. Ind. Acc. Comm., 181 Cal. 550, 185 P. 953. Such a definition is merely a convenient device for simplifying the phraseology of the legislation.

It follows that if we assume that the Wagner Act was effective before the strike began, the striking employees in the case at bar would be deemed to be employees of the respondent; but the Wagner Act did not go into effect until after the employer notified all striking employees that their employment had terminated. There is no doubt of the constitutional and common-law right of an employer to discharge his employee at any time. The fact that a strike is in progress would not under the common law prevent such a discharge. The employer's only remedy was to secure other employees, unless he wished or was compelled to accept the terms of the strikers. The Board suggests in its argument that a discharge to be effective must be actual and sincere and not a mere subterfuge adopted for the purpose of intimidating the strikers. When the discharge occurred the law knew no such limitation. Under the terms of the Wagner Act, which formally recognizes the right of employees who have ceased work on account of current labor disputes to bargain collectively, it may be that the right to bargain collectively could not be terminated by a summary or fictitious discharge before collective bargaining had taken place.

The parties have based their arguments with regard to the applicability of the Wagner Act to the conduct of the respondent and its employees after July 5, 1935, upon the question of the constitutional power of the Congress of the United States to compel collective bargaining with discharged employees. The respondent in effect asserts that Congress has no constitutional power to make employees of those who are not such in fact; that Congress has no power to change the status of its already discharged employees. The Board asserts that Congress has such power and has exercised it in the Wagner Act. Assuming, as we must, under the recent decision of the Supreme Court, that Congress has power to promote collective bargaining, both to prevent strikes and to facilitate their settlement, Congress would undoubtedly have constitutional power to deal with all such strikes as were in progress at the time it acted by requiring the employer to bargain collectively with its former employees. It could by definition, as it has done, include within the group entitled to collectively bargain with an employer, those who are on a strike because of a dispute over the terms of their employment. From the standpoint of the constitutional power of Congress it would make no difference when the strike began.

Turning to the contention of the respondent that its relations with the strikers were terminated when it informed them that they were discharged, paid them off, and closed its plant, it is clear that such action on the part of the employer, where the employees have ceased to perform the duties of their employment, was at common law and at the time of the discharge by the respondent on June 25, 1935, an effective termination of the employment. The Board does not contend otherwise. In this connection it should be borne in mind that the employer, as well as the employee, has constitutional, and common law, rights. As the employees have a right to strike and thus force the employer to terms if they can, so the employer has the corresponding right to secure other employees to fill the places of the strikers and thus continue its operations.

Respondent, in the case at bar, before the enactment of the Wagner Act, chose another alternative and closed its plant, paying off its employees, so that in law and in fact at that time the contractual relation between the striking employees and the employer ceased.

Under the recent decisions of the Supreme Court, there is no doubt of the constitutional power of Congress to require collective bargaining with its former employees although the discharge of the employees occurred before Congress acted, if the controversy between the employer and its former employees still directly affects interstate or foreign commerce. It is not the technical relation of employer and employee that gives rise to the constitutional power; it is the disastrous effect of labor disturbances upon interstate commerce which does so. As the Board carefully points out, this effect upon commerce continued in the case at bar long after the adoption of the Wagner Act. The question then is not one of constitutional power, but one of statutory interpretation. That is, of whether or not the Wagner Act, properly construed, applies to a situation where the relation of employer and em-

ployee had terminated before the act was passed.

A majority of the Circuit Court of Appeals for the Fourth Circuit, in Jeffery-De Witt Insulator Co. v. National Labor Relations Board, supra, decided June 16, 1937, Judge Northcott dissenting, held that the National Labor Act was applicable to employees on a strike at the time of the passage of the Wagner Act. In that case there was no formal discharge of the striking employees. That court based its conclusion upon authorities supporting its statement that, "irrespective of the statute, therefore, the strike did not of itself result in a complete severance of the relationship which had been established between the company and its employees."

In the case at bar we have in addition to the strike the formal discharge and pay off to which we have referred. The question is as to the retroactive effect of the statute. That is, were the striking union members employees within the meaning of the Wagner Act, 29 U.S.C.A. § 152(3), which provides that the term "employees" shall include those "whose work has ceased as a consequence of, or in connection with, any current labor dispute"? If this statutory definition is given a prospective rather than a retrospective interpretation, it means, in effect, those "whose work shall hereafter cease, as a consequence of, or in connection with, any current labor dispute," etc. If it is given a retrospective interpretation, it should read, "whose work has heretofore or may hereafter cease as a consequence of, or in connection with, any current labor dispute," etc., or words to that effect. In deciding this question there is a basic and elementary rule of statutory construction to be applied; that is, that a statute shall not be given retroactive effect unless the intention of the Legislature so to do is clearly expressed or necessarily implied. This rule is applicable to all statutes dealing with substantive rights. The rule is not always expressed in the same language. Variously expressed it will be found in a host of decisions. I refer to a statement of the rule in some of the more recent decisions of the Supreme Court. In Fullerton-Krueger Lumber Co. v. Northern Pac. Ry., 266 U.S. 435, 45 S.Ct. 143, 144, 69 L.Ed. 367, Justice McReynolds, speaking for the court, quoting from Harvey v. Tyler, 2 Wall. 328, 347, 17 L.Ed. 871, said: "It is a rule of construction, that all statutes are to be considered prospective, unless the language is expressly to the contrary, or there is a necessary implication to that effect."

In Miller v. United States, 294 U.S. 435, 55 S.Ct. 440, 442, 79 L.Ed. 977, it is said: "The law is well settled that generally a statute cannot be construed to operate retrospectively unless the legislative intention to that effect unequivocally appears. * * * The principle is strictly applicable to statutes which have the effect of creating an obligation."

(In the case at bar the statute creates the obligation to bargain collectively with the employees and denies the unqualified inherent right of discharge theretofore recognized.)

In Brewster v. Gage, 280 U.S. 327, 50 S.Ct. 115, 118, 74 L.Ed. 457, it is said: "Ordinarily, statutes establish rules for the future, and they will not be applied retrospectively unless that purpose plainly appears."

The question is dealt with more at length by the Supreme Court in Shwab v. Doyle, Collector, 258 U.S. 529, 42 S.Ct. 391, 392, 66 L.Ed. 747, 26 A.L.R. 1454, in an opinion by Justice McKenna, where it is said:

"The initial admonition is that laws are not to be considered as applying to cases which arose before their passage unless that intention be clearly declared. 1 Kent, 455; Eidman v. Martinez, 184 U.S. 578, 22 S.Ct. 515, 46 L.Ed. 697; White v. United States, 191 U.S. 545, 24 S.Ct. 171, 48 L.Ed. 295; Gould v. Gould, 245 U.S. 151, 38 S.Ct. 53, 62 L.Ed. 211; Story, Const. § 1398. The comment of Story is:

" 'Retrospective laws are, indeed, generally unjust, and, as has been forcibly said, neither accord with sound legislation nor with the fundamental principles of the social compact.'

"There is absolute prohibition against them when their purpose is punitive; they then being denominated ex post facto laws. It is the sense of the situation that that which impels prohibition in such case exacts clearness of declaration when burdens are imposed upon completed and remote transactions, or consequences given to them of which there could have been no foresight or contemplation when they were designed and consummated."

Continuing with reference to the **act** there under consideration (Act of September 8, 1916, 39 Stat. 756), it is said:

"There is certainly in it no declaration of retroactivity, 'clear, strong, and imperative,' which is the condition expressed in United States v. Heth, 3 Cranch 399, 413 (2 L.Ed. 479); also United States v. Burr, 159 U.S. 78, 82, 83, 15 S.Ct. 1002, 40 L. Ed. 82.

"If the absence of such determining declaration leaves to the statute a double sense, it is the command of the cases that that which rejects retroactive operation must be selected."

In United States v. St. Louis, S. F. & T. Ry., 270 U.S. 1, 46 S.Ct. 182, 183, 70 L.Ed. 435, Judge Brandeis, speaking for the Supreme Court, said: "That a statute shall not be given retroactive effect, unless such construction is required by explicit language or by necessary implication, is a rule of general application."

The rule with reference to prospective construction of a statute is also stated in the text-books. In 25 R.C.L. "Statutes," § 35, p. 787, it is said: "There is always a presumption that statutes are intended to operate prospectively only, and words ought not to have a retrospective operation unless they are so clear, strong, and imperative that no other meaning can be annexed to them, or unless the intention of the legislature cannot be otherwise satisfied. Every reasonable doubt is resolved against a retroactive operation of a statute. If all of the language of a statute can be satisfied by giving it prospective action only that construction will be given it. Especially will a statute be regarded as operating prospectively when it is in derogation of a common law right, or the effect of giving it retroactive operation will be to destroy a vested right or to render the statute unconstitutional."

The rule is thus stated in 36 Cyc. p. 1205: "It is a rule of statutory construction that all statutes are to be construed as having a prospective operation unless the purpose and intention of the legislature to give them a retrospective effect is expressly declared or necessarily implied from the language used. In every case of doubt the doubt must be resolved against the retrospective effect."

It follows from the cardinal and elementary rule of statutory interpretation announced in these decisions and stated in the text-books that when Congress provided in the Wagner Act that when employees "have ceased work because of a current labor dispute" they shall still be deemed to be employees, it speaks to the future and deals with employees who thereafter shall have ceased work, and not with those employees who had theretofore ceased work.

In considering the question of whether or not this statute if applied to the former employees of the respondent who struck and were discharged on June 25th, it is the implied though not expressed contention of the Board that Congress dealt with a status created by a strike and not with the strike itself which antedated the legislation. Does the Wagner Act require the employer to bargain with employees who had ceased to be such when the act was passed? In Reynolds v. United States, 292 U.S. 443, 54 S.Ct. 800, 78 L.Ed. 1353, it is pointed out that a "statute is not rendered retroactive merely because the facts or requisites upon which its subsequent action depends, or some of them, are drawn from a time antecedent to the enactment"; citing Cox v. Hart, 260 U.S. 427, 43 S.Ct. 154, 67 L.Ed. 332. The same rule is again stated in Lewis v. Fidelity & Deposit Co. of Maryland, 292 U.S. 559, 54 S.Ct. 848, 853, 78 L.Ed. 1425, 92 A.L.R. 794, where, in an opinion by Judge Brandeis, it is said: "A statute is not retroactive merely because it draws on antecedent facts for its operation"; citing Cox v. Hart, 260 U.S. 427, 43 S.Ct. 154, 67 L.Ed. 332, supra; Ewell v. Daggs, 108 U.S. 143, 2 S.Ct. 408, 27 L.Ed. 682; and other cases.

But this rule does not aid us in interpreting the act which must be treated as prospective and not retrospective. For legislative purposes it creates a status with certain rights appertaining thereto, notably, collective bargaining. To treat the legislation as dealing with a status already created is ipso facto to give the statute a retroactive effect, and this, as the authorities cited hold, may not be done except by express legislative declaration or by necessary implication. In the case at bar there is no direct expression of legislative intent to deal with past transactions, and the only implication which would justify such construction would arise from the fact that current labor disputes of whatever nature are liable to interfere with interstate commerce. But this implication is far from a

"necessary implication" sufficient to show that the statute was intended to have a retroactive effect, for the mischief aimed at is an ever present and continuing one.

The Wagner Act places such heavy obligations upon the employer that it should only be considered as retroactive if the act expressly requires it. For instance, in the case at bar if the order of the Board is enforced it will involve payment of nearly two years' compensation to 221 employees who have not worked for, but against, the respondent during that period. The Board has not found the exact amount to be paid to each employee, but the aggregate must be in the neighborhood of $250,000. This penalty is based upon the refusal of the employer to meet the representatives of the union for collective bargaining, although the respondent then and now in apparent good faith contends that the members of the union were not its employees when the Wagner Act became effective. The Board recognized the futility of collective bargaining with the union where the respondent had reopened its plant with a force of employees composed in part of those who had belonged to the union and in part of newly-employed laborers. It is because collective bargaining would obviously result in the refusal of the employer to restore all its former employees that the Board made its order, not only requiring the respondent to offer employment to them, but also to pay to them the large amount hereinbefore referred to.

In dealing with a subject of such importance and involving the substantial rights of so many persons, the intention of Congress to deal with past transactions should be directly expressed, or the implication to make the law applicable thereto should be more clearly implied than is the case here, where the only implication in favor of a retroactive interpretation of the law lies in the declared purpose of Congress to promote industrial peace as it affects interstate commerce.

The striking employees of the respondent had ceased work and had been discharged before the Wagner Act was passed. The respondent had shut down its plant, the discharged employees do not come within the term "employee" as defined in the Wagner Act unless given a retroactive effect, although if they had ceased work during a current labor dispute occurring after the act became effective the act would be applicable.

If this conclusion is correct, it follows that there was no unfair labor practice involved in the refusal to bargain with the representatives of the union, and the order of the Board based upon such refusal requiring restoration to employment and back pay to such persons cannot be enforced.

The requirement that the respondent renounce the provisions of its employment contract requiring a disaffirmance of union labor affiliations is not contested, and the order of the Board in that regard should be enforced at once.

The Wagner Labor Relations Act authorizes the Labor Board "to take such affirmative action, including reinstatement of employees with or without back pay, as will effectuate the policies of this act [chapter]," section 10(c) 29 U.S.C.A. § 160(c), and authorizes the Circuit Court of Appeals, upon application for enforcement order, "to make and enter upon the pleadings, testimony, and proceedings set forth in such transcript a decree enforcing, modifying, and enforcing as so modified, or setting aside in whole or in part the order of the Board." Section 10(e) 29 U.S.C.A. § 160(e). In my opinion in National L. R. B. v. Mackay, etc., Co., 9 Cir., 92 F.2d 761, decided October 19, 1937, on rehearing, I expressed the view that the limit of the Labor Relations Board's authority to reinstate a striking employee was to restore to that employee the right to collectively bargain, and that the authority given in the National Labor Relations Act to reinstate employees could not consistently be extended to require the employer to again employ those who voluntarily struck. It would follow that employees not being in a pay status at the time of the alleged violation of the Wagner Labor Relations Act are not entitled to back pay for the period during which they were unemployed because of their voluntary acts.

I therefore conclude: (1) That the Wagner Act does not apply to the employee of the company who had quit work by reason of a strike and had been discharged before the act was enacted; (2) the act does not authorize a requirement that a striking employee be re-employed or that he be given back pay.