## NATIONAL LABOR RELATIONS BOARD v. COLUMBIAN ENAMELING & STAMPING CO., Inc.

No. 6324.

Circuit Court of Appeals, Seventh Circuit.
April 28, 1938.

Charles Fahy, Gen. Counsel, National Labor Relations Board, Robert B. Watts, Associate Gen. Counsel, Thomas I. Emerson, Laurence A. Knapp, and Owsley Vose, all of Washington, D. C., for petitioner.

Earl F. Reed, of Pittsburgh, Pa., Otto A. Jaburek, of Chicago, Ill., and C. M. Thorp, Jr., John E. Laughlin, Jr., Charles C. Hewitt, and Thorp, Bostwick, Reed & Armstrong, all of Pittsburgh, Pa., for respondent.

Paul R. Shafer, of Terre Haute, Ind., for interveners.

Before EVANS, SPARKS, and TREANOR, Circuit Judges.

EVANS, Circuit Judge.

Petitioner seeks the enforcement of an order ·of the National Labor Relations Board directing the respondent company to reinstate employees, who had theretofore gone on a strike and had been replaced by other employees. The order [1] of the Board was predicated on a finding that the company had been guilty of unfair labor prac-

1 "On the basis of the findings of fact and conclusions of law and pursuant to section 10, subdivision (c) of the National Labor Relations Act [29 U.S.C.A. § 160(c)], the National Labor Relations Board hereby orders that the respondent, the Columbian Enameling & Stamping Company, and its officers and agents, shall take the following action, which the Board finds will effectuate the policies of the Act:

"1. Discharge from its employment all production employees who were not employed by it on July 22, 1935, and reinstate to the vacancies so created individuals who were so employed and have not since received substantially equivalent employment elsewhere and place the remainder of such individuals on a list to be called for reinstatement as and when their labor is needed.

"2. Upon reinstating its employees as required in paragraph 1 of this order, shall cease and desist from refusing to bargain collectively with Enameling & Stamping Mill Employees Union No. 19694 as the exclusive representative of the production employees employed by respondent in respect to rates of pay, wages, hours of employment, and other conditions of employment.

"3. File with the National Labor Relations Board on or before the thirtieth day from the date of service of this Order, a report in writing setting forth in detail the manner and form in which it has complied with the foregoing requirements."

tices; namely, refusal to bargain with the union which represented a majority of its employees.

The employees who had been hired to replace the strikers have intervened and appear separately.

The conflict between the company and the union has been protracted and bitter. It covers several issues. We find it necessary to state the facts somewhat in detail to give a thorough understanding of the case.

The Facts: The Columbian Enameling and Stamping Company, an Indiana corporation, located at Terre Haute, Indiana, manufactures and sells enamelware. It employed about 600 persons, 500 of whom were production and maintenance employees who were eligible to membership in the Enameling and Stamping Mill Employees Union, No. 19694. About 485 of the 500 eligible employees belonged to the union. The strike began March 22, 1935; the National Labor Relations Act became effective, July 5, 1935; and the specific day on which the company is alleged to have refused to bargain is July 23, 1935. The labor agreement between respondent and its employees ran for a year and expired July 14, 1935. Because of the importance of the chronological presentation of the successive steps in this conflict, we set them forth in detail. [2]

| [2] July 14, 1934 | Company and Union contracted to arbitrate, for one year, future differences.[†] Company at first refused to contract but Fed. labor officials effected agreement. |
| July 14, 1934 | Union 19694 formed (A. F. of L. affiliate). By September, 1934, 450 or 500 production employees were members. |
| Aug. 8, 1934 | Union Scale Com. requested Co. to institute "check-off" system. |
| October 4, 1934 | Company started sending circular letters to all employees setting forth its position re conflict. |
| Oct. 4, 1934 | Company notified employees it would not use "check-off" system because it believed it to be illegal unless new assignments of pay were made every 30 days. |

[†]Labor Contract of Columbian Enameling & Stamping Company, Inc. and Its Employees.

"At a meeting held in the offices of the Indianapolis Regional Labor Board on July 14, 1934, presided over by Dr. Earl R. Beckner, Chairman, the above parties agreed to the following contract:

"(1) Seniority rights shall prevail throughout the plant. In the event that it becomes necessary to reduce the force of employees, the last employee entered upon the Company's payroll shall be the first employee to be furloughed. No new employees shall be employed until all furloughed employees have been returned to work. In the recalling of furloughed employees for duty, the oldest employee in point of service shall be the first employee to be returned to duty. The seniority rule shall be applied on the basis of departments within the plant.

"(2) Employees of either sex will be promoted upon the basis of competency. Management shall have the right to determine competency.

"(3) No employees have been or will be discriminated against because of his or her membership in or non-membership in, affiliation with or non-affiliation with any union or labor organization.

"(4) A rest-period shall be granted to all female laborers of ten minutes for every four hours of labor performed. This is to apply to all other departments where the rest-period is now practiced. * * *

"(5) When either party to this agreement desires to terminate or modify this agreement, he shall give written notice to the other party at least thirty days in advance of such termination.

"(6) In the event that it becomes necessary to reduce the amount of employment given, management agrees to spread the available work among all the employees. Management reserves the right to determine at what point it becomes necessary to lay off employees rather than spread the work.

"(7) Any employee dismissed from the service of the Company shall be given a hearing within three days from date of dismissal, hearing to be conducted by representatives of the employee and the management. Should it be determined that the employee involved has been unjustly dismissed, such employee shall be restored to duty and paid for time lost.

"(8) Management will endeavor to provide proper ventilation in the factory.

"(9) * * *

"(10) A committee representing employees in the various departments shall be privileged to take up any grievance that may arise in their respective departments with the foreman in charge of said department. Failing to adjust such grievance, the committee shall be permitted to refer the matter to the Department Superintendent, from him if necessary to the Plant Superintendent and finally to the General Manager of the Company.

"In any case in which a satisfactory settlement of a dispute arising under this contract cannot be reached, such dispute shall be referred to a committee of arbitration composed of two persons selected by the Management, two persons selected by the Union, and fifth

| | | |
|---|---|---|
| Oct. | 30, 1934 | Company notified union it would negotiate, Nov. 23 (postponed to Nov. 26). |
| Nov. | 26, 1934 | Mr. Taylor (Fed. Labor man) and Scale Com. met with Company and asked for closed shop. Company's representative refused; asked for 20% increase in pay, but company said conditions did not warrant it. |
| Jan. | 4, 1935 | Scale Com. presented demands to Company: (1) that Company agree to lay off any member suspended by union. Company refused; (2) asked for closed shop. |
| Feb. | 5, 1935 | Union asked for arbitration on these subjects. |
| Feb. | 7, 1935 | Meeting between company and union. |
| Feb. | 8, 1935 | Company sent letter to union, employees, etc. stating proposals of Jan. 4 not within purview of arbitration agreement. |
| Feb. | 9, 1935 | Union wrote Company not to send out circular letters because they did not want other non-members and foremen to know of their affairs, and asked that company deal with scale committee. |
| Feb. | 19, 1935 | Company circular letter to employees and union, citing section 7 (a) of N. I. R. A., 15 U.S.C.A. § 707 (a). |
| Mar. | 5, 1935 | Meeting between Company and Union. |
| Mar. | 5, 1935 | Company told Scale Com. it would show it all circular letters first and let it state objections thereto. |
| Mar. | 11, 1935 | Scale Com., Company and Mr. Taylor met to discuss Jan. 4 proposals. |
| Mar. | 17, 1935 | Union sent Company a letter containing resolutions—recited Company's failure to agree to arbitrate re proposals; said they would not work with anyone who could have joined union and did not. |
| Mar. | 1935 | 485 production employees were members of union. |
| Mar. | 22, 1935 | Union moved to call strike and all members of union struck. |
| Mar. | 22, 1935 | Since this time, majority of units of employees have designated union as collective bargaining agent. |
| Mar. | 23-July 23, 1935, the Company's plant was closed. Picketing since March 23, except during time of martial law. Sometimes 50 pickets. Sometimes unruly crowds who caused much destruction. |
| March 23, 1935 | | Conciliator from Dept. of Labor tried to settle strike. He stated all union wanted was closed shop and company refused and conciliator quit. |
| Mar. | 30, 1935 | Company announced building closed indefinitely. |
| May | 10, 1935 | Mayor of Terre Haute requested conference between the company and union. Company refused stating uselessness of meeting because it would not have closed shop and agreement so provided. |
| May | 20, 1935 | After May 20 the Company foreman solicited individuals to return to work and many did. |
| June | 7, 1935 | Company advertised in Terre Haute newspaper saying it was willing to open and operate "without union recognition or agreement" taking back union and non-union men indiscriminately. |
| June | 7, 1935 | Scale Committee asked meeting. |
| June | 11, 1935 | Conference between representatives of both sides. |
| July | 5, 1935 | National Labor Relations Act became effective. 29 U.S.C.A. § 151 et seq. |
| July | 19, 1935 | Company made plans to reopen shop and union interfered; 40 men accompanied into plant by police. |
| July | 22, 1935 | General labor strike called in protest of use of police and included all Terre Haute; terminated next day. On July 22, there were 15,000 persons around plant and missiles were thrown; militia called and martial law proclaimed and picketing forbidden. |
| July | 23, 1935 | Company reopened plant and filled positions, some old union employees and some new men. By Aug. 19, 190 old employees returned. By Sept. 1935, company had full force. |
| July | 23, 1935 | Two Department of Labor conciliators conferred with Company and they agreed to confer with union, and several days later company changed mind, and refused to confer further. |

person to be selected by these four, who shall reach a decision which shall be final and binding upon both parties to this contract. There shall be no stoppage of work by either party to this contract, pending decision by the Committee of Arbitration.

"(11) Wherever possible the management shall limit the hours of work to eight per day. * * *

"In drafting the contract which was signed on July 14th, 1934, by the representatives of the company and of its employees one clause which had been agreed to was inadvertently omitted. The clause follows:

"(12) This contract shall run for a period of one year from date, that is, until July 14, 1935.

"It is agreed by the parties to the contract as originally drafted and signed on July 14, 1934, that the above clause be and hereby is made a part of the original contract and is to be appended thereto. * * * "

The issues of law are:

(1) The constitutionality of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq. [3]

(2) Whether there is evidence to support the Board's finding of unfair labor practices, and if so whether interstate commerce, if found to exist, is thereby burdened.

(3) Whether the Board's order is valid. If so, whether it can be enforced to the detriment of the intervenors, present employees.

## CONTENTIONS AND COUNTER–CONTENTIONS.

| Respondent's Contentions. | Petitioner's Contentions. |
|---|---|
| 1) The act is unconstitutional. | 1) The act has been held constitutional (National Labor Relations Bd. v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352, and other cases.) |
| 2) Interstate commerce is not involved because both raw materials and finished products remain at rest in the Company's place for several months before and after interstate shipment and therefore the continuity in interstate commerce shipment is broken. | 2) Majority of raw material used in the manufacture comes from 20 states; and 85% of manufactured product is shipped to 47 states; three interstate railroads and eight interstate truckers are used. |

| | | |
|---|---|---|
| August 4, 1935 | Picketing resumed. |
| Sept. 20, 1935 | Company refused to bargain collectively with union. Company did not answer letters of Union asking for conference. |
| Oct. 11, 1935 | (Same occurrence as on Sept. 20, *supra*.) |
| Oct. 28, 1935 | A union official asked company to take back striking employees but company refused and told official they could sign application for employment. |
| Oct. 31, 1935 | Union filed with regional director a complaint that the company was engaging in unfair labor practices forbidden by the N. L. R. A. |
| Nov. 21, 1935 | Board issued complaint against Company for unfair acts under section 8 (1) and (5) and section 2 (6) and (7), 29 U.S.C.A. §§ 158(1, 5), 152(6, 7). |
| Dec. 2, 1935 | Company filed answer alleging: (a) Act was unconstitutional, (b) Company was not engaged in interstate commerce; (c) Allegations do not constitute charge of unfair labor practices; (d) In July and August, Company gave opportunity to striking employees to return and many did; (e) Union made demands contrary to labor agreement such as for closed shop and demanded arbitration of it although not in agreement. |
| Dec. 9, 1935 | Trial begun before labor board examiner, and closed December 11, 1935. |
| Dec. 16, 1935 | Board ordered proceeding transferred before it for determination. |
| Feb. 14, 1936 | Order of Board for reinstatement. |
| July 9, 1937 | Board filed petition with this court for enforcement of its order. |

[3] These provisions read as follows:

Section 8(1, 5), 29 U.S.C.A. § 158(1, 5): "It shall be an unfair labor practice for an employer—

"(1) To interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 [157 of this title]. * * *

"(5) To refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 9 (a) [159(a) of this title]."

Section 7, 29 U.S.C.A. § 157 provides:

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection."

Section 9 (a), 29 U.S.C.A. § 159(a), provides:

"Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment: *Provided*, That any individual employee or a group of employees shall have the right at any time to present grievances to their employer."

Section 2 (3), 29 U.S.C.A. § 152(3): "The term 'employee' * * * shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment. * * *"

*Respondent's Contentions.*

3) Further conferences would have been useless because all that union was demanding was a closed shop, and company would not so operate.

4) The act was passed after the strike and therefore is inapplicable; furthermore, the strike was an illegal one because there was an arbitration agreement, and being an illegal strike or strike in violation of wage and employment agreement, the relationship of employer and employee had been terminated. The arbitration contract provided that there should be no strikes.

*Petitioner's Contentions.*

3) Union was demanding other things than closed shop, such as 2 hour pay when machinery broke down. Union was asking for the conferences, which was indicative of fact that they were in conciliatory mood.

4) The act is applicable, and need not be retroactively construed to be here applicable because the refusal to meet and confer occurred on July 22 and thereafter, after the passage of the act, and the company had refused to arbitrate, and the arbitration agreement only provided that there should be no strike while a matter was pending before the Committee of Arbitration. A strike does not terminate the employer-employee relationship (Citing the Michaelson Case, Michaelson v. U. S. ex rel. Chicago, St. P., M. & O. R. Co., 7 Cir., 291 F. 940). The National Labor Act has been held applicable in two cases where the strike occurred prior to its passage. Jeffery-DeWitt Insulator Co. v. National Labor Relations Board, 4 Cir., 91 F.2d 134, 139, 112 A.L.R. 948, cer. denied, Oct. 18, 58 S.Ct. 55, 82 L. Ed. ——; Carlisle Lumber Co. Case, National Labor Rel. Board v. Carlisle Lumber Co., 9 Cir., 94 F.2d 138, now pending on application for certiorari in Supreme Court, filed Mar. 30.

Subsequent to the argument of this case the Supreme Court announced decisions in the following cases [4] which have narrowed the issues through the final determination of what previously were controverted legal questions.

It may be and is assumed for the purposes of this case that the National Labor Relations Act is an authorized exercise of power by Congress and is valid, and that one out on strike does not thereby ordinarily interrupt the employer-employee relation previously existing. In other words, the status of the employee, as such, is not broken by the strike. (Some of the authorities so holding, including those of this court, are collected in the margin. [5])

We accept without discussion, as it seems clear under the recent decisions of the Supreme Court, petitioner's view that respondent is engaged in interstate commerce. [6]

It may also be assumed that ordinarily the status of employer-employee exists although the strike occurred before the passage of the National Labor Relations Act and continued after its passage.

These conclusions, however, do not meet or solve our question. We have a case where the parties (the employer and employees) bound themselves by a written agreement on the subject:

"In any case in which a satisfactory settlement of a dispute arising under this contract cannot be reached, such dispute shall be referred to a committee of arbitration composed of two persons selected by

---

[4] National Labor Relations Board v. Penn. Greyhound Lines, Inc., 58 S.Ct. 571, 82 L. Ed. ——, decided February 28, 1938; National Labor Relations Board v. Pacific Greyhound Lines, Inc., 58 S.Ct. 577, 82 L.Ed. ——, decided February 28, 1938; Lauf v. Shinner & Co., 58 S.Ct. 578, 82 L.Ed. ——, decided February 28, 1938; and Santa Cruz Fruit Pkg. Co. v. National Labor Relations Board, 58 S.Ct. 656, 82 L.Ed. ——, decided March 28, 1938.

[5] Michaelson v. United States ex rel. Chicago, St. P., M. & O. R. Co., 7 Cir., 291 F. 940 (reversed on other grounds in 266 U.S. 42, 45 S.Ct. 18, 69 L.Ed. 162, 35 A.L.R. 451; Iron Molders' Union v. Allis-Chalmers Co., 7 Cir., 166 F. 45, 20 L.R.A.,N.S., 315; Tri-City Trades Council v. American Steel Foundries, 7 Cir., 238 F. 728; Nat. Labor Relations Board v. Carlisle Lumber Co., 9 Cir., 94 F.2d 138, decided December 13, 1937; Jeffery-DeWitt Insulator Co. v. National Labor Relations Board, 4 Cir., 91 F.2d 134.

[6] Electric Bond & Share Co. v. Securities & Exchange Commission, 58 S.Ct. 678, 82 L. Ed. ——, decided March 28, 1938; Santa Cruz Fruit Pkg. Co. v. National Labor Relations Board, 58 S.Ct. 656, 82 L.Ed. ——, decided March 28, 1938; National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352.

the Management, two persons selected by the Union, and fifth person to be selected by these four, who shall reach a decision which shall be final and binding upon both parties to this contract. There shall be no stoppage of work by either party to this contract, pending decision by the Committee of Arbitration."

It is in view of this agreement of the parties that our question arises.

What is the status of a group of employees who in the face of such a definite agreement left their employment? Is the doctrine of estoppel not applicable to parties to such an agreement? Is the maxim of equity that one who comes into a court of equity must come with clean hands, not applicable?

No foundation more secure and reassuring or more protective of the rights of both labor and capital can be found than that *reasonable* contracts, *not violative of public policy,* should be respected by the parties who pledged their words and their integrity to abide by their terms. We grope only in darkness and trek further into the wilderness of confusion and lost landmarks if we lose sight of this beacon light. Progress lies only in respect for one's agreement. Respect for and support of the cause of labor follows labor's respect for its contract. The same Bill of Rights which through one section gives just protection to labor, through another section protects the just rights of others. Overriding one will result in the overthrow of the entire Bill of Rights.

In applying these observations to the instant case it is important to keep in mind the limitations which we have imposed. Only *reasonable* agreements are specified. *Not violative of any rule of statute or public policy* is another necessity. These are all important limitations to be observed and for several good reasons.

We are not blind to the fact that the purpose of governmental activity in labor matters is to treat all as nearly equally as is possible under existing conditions; that in dealings between employer and employee the former may hold the whip hand to the great disadvantage of the latter when the employees are numerous and unable to act collectively; hence collective bargaining is authorized. Nor can we fail to observe that where large groups, veritable armies in size, are collectively acting, there is possible danger lurking in the result of mass drives.

Intolerance of the rights of others may result.

As so often occurs, parties deeply interested, and prejudiced by their interests, and seeing red, suffer from the delusion that numerical strength measures right; that so many, sincerely convinced of the merits of their cause, cannot be wrong. Alas, such an attitude is but another phase of the erroneous philosophy that might makes right. As the major premise of any syllogism, it leads only to erroneous conclusions and catastrophic results.

When the state or nation speaks through legislation which the Supreme Court approves as valid, we must accept it as an expression of public policy which we are to enforce willingly and in the spirit of its enactment. The National Labor Relations Act is such legislation. It was enacted after the strikers had withdrawn their services. In other words, at the time they went on strike there was in force no National Labor Relations Act and the employees acted in the face of their agreement—"There shall be no stoppage of work by either party to this contract, pending decision by the Committee of Arbitration."

In the face of such an agreement, were they strikers, that is, was there an employer-employee relationship existing, when they quit work? Did the status of employer-employee continue as to them after they quit?

We must answer this question in the negative. They are estopped to say that their violation of their specific agreement not to strike may be by them ignored and repudiated. Moreover, they have no standing in a court of equity to ask relief in the face of a solemn agreement which was reasonable, and which they deliberately breached.

The agreement which they had entered into ran for a single year. In three months more, it would have ended. Not only did the employees agree not to strike during the year, but they agreed to submit their arbitrable differences to arbitration. Such an agreement was promotive of the best interests of both parties. Surely no reasonable person could say it was unreasonable or unfair or indicative of duress. Surely, in the solution of the perplexing and troublesome questions arising out of the attempted settlement of labor disputes, the parties can adopt no principle as the basis of negotiations or of subsequent conduct, more sound,

safe, and sane than that wage agreements, understandings made by authorized representatives, and reasonable in the period of their application, must be respected.

This conclusion does not mean that we approve or uphold the refusal of the respondent to meet the request of the conciliators and enter into negotiations looking towards the settlement of disputes after the employees had quit their employment. Respondent's employees were largely unionized. Under the Act, respondent, when requested to negotiate, had a moral duty to do so. National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352. Instead it leant a friendly ear to unwise counsel wholly out of sympathy with the legislation designed to avoid and settle capital-labor disputes. It erred in its refusal to respect that law and ignore the request of those charged with the burdensome task of working out a peaceful solution of what had become a bitter controversy. There is little or no explanation which we can find for their refusal, save an open defiant, flouting of the law of the land.

It must be freely conceded that labor has the right to quit work. It had, prior to the enactment of the National Labor Relations Act, the right to strike. That statement of the law in the abstract is elementary. It has, however, a few limitations. One of them is where labor has expressly agreed for a limited time not to strike but to submit disputes to arbitration.

When, before the passage of the National Labor Relations Act, labor quit employment in the face of such a specific agreement, reasonable in time and in conditions and not violative of statutory law nor of public policy, then labor estopped itself to call the termination of its employment, a strike. More, it had no standing in a court of equity to enforce rights growing out of its employer-employee relationship which it thus repudiated through termination of its contract. To that extent the right to strike is limited. For if a right is unenforceable or non-recognizable, it can hardly be called a right.

There are two propositions which the employers of labor and the employees must recognize and respect:

(a) The National Labor Relations Act is valid and constitutes a part of the laws of the land. Its provisions apply to all employers who are engaged in interstate commerce.

(b) Reasonable contracts of labor employment, not violative of any statute or public policy, which deal with compensation and working conditions must be respected by all employers entering into such agreements.

Courts have the plain duty of rigidly enforcing both these legal propositions. In no other way can the public welfare be promoted and the rights of both labor and capital be protected.

In disposing of this case we are confronted by a single question. The National Labor Relations Board held that the former employees of respondent, who went on a strike before the enactment of the Act in violation of their reasonable agreement not to strike, but to submit their differences to arbitration, were entitled to invoke the aid of a court of equity to secure reinstatement of the contract they voluntarily terminated. In so holding petitioner erred.

The holding in this case is, of course, restricted to the particular facts in this case which are:

(a) The withdrawal of the employees before the National Labor Act was enacted.

(b) The employees had a valid short time wage agreement during which they agreed not to strike but to submit differences growing out of the agreement to arbitration.

(c) The employees ceased working in the face of their wage agreement with its anti-strike provision and at a time when there was no Federal Labor Act in force.

It is needless to add that we are not required to pass upon, nor do we pass upon a case where any one or all of said relevant factors are absent.

It follows that the petitioner's petition for the order of enforcement sought must be and it is denied.

SPARKS, Circuit Judge. I concur in the conclusion.

TREANOR, Circuit Judge (dissenting).

If I correctly understand the opinion and decision of the majority, it rests upon the assumption that the employees of respondent company could not invoke the jurisdiction of the National Labor Relations Board because the aforesaid employees had gone on a strike in violation of an agreement between the employees and respondent company.

It is clear from the chronological presentation of the successive steps in the controversy between the employees and respondent company [7] that a labor dispute existed between the employees and their employer, and that as a result of this dispute the employees struck. Granting that the employees, in view of an existing contract, were making unjustifiable demands upon the employer, the fact remains that there was a labor dispute; also, the fact was that the employer refused to submit to arbitration the questions raised by the employees' demands. It may be that the employer was correct in claiming that the demands covered matters which were not included in the existing arbitration agreement between the employer and employees. But at any rate no committee of arbitration was appointed prior to the strike, and the clause of the agreement, which it is assumed that the employees violated by striking, provides that "there shall be no stoppage of work by either party to this contract, pending decision by Committee of Arbitration."

The question for this Court to decide is whether the order of the National Labor Relations Board was within its statutory authority under the National Labor Relations Act. The conduct of respondent's employees was a fact for the Board to consider in determining the ultimate fact of unfair labor practice by the employer; but in my opinion our decision in the cause presented by the petition of the Board for enforcement of its order does not turn on the rightfulness or wrongfulness of the strike of respondent's employees.

The situation which arose out of the employees' demands, and the refusal of the respondent company to accede to, or to arbitrate, these demands, clearly constituted a "labor dispute" within the definition of that term in section 152(9) of 29 U.S.C.A., the National Labor Relations Act. [8] And since by definition the term employee "shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute," [9] it necessarily follows that for the purposes of the National Labor Relations Act the relationship of employee-employer still existed when the alleged unfair labor practices occurred; and that such relationship, for purposes of jurisdiction of the National Labor Relations Board, continued to exist up to and including the date of the filing of the complaint in which it was charged that the company was engaging in unfair labor practices.

The order of the National Labor Relations Board was predicated upon the finding that the respondent company had been guilty of unfair labor practices, in that it had refused to bargain collectively with the representatives of the employees. There was some evidence to support this finding and this court cannot disturb it. On the basis of such finding the Board is expressly authorized by the act "to take such affirmative action, including reinstatement of employees with or without back pay, as will effectuate the policies" [10] of the act.

It was the duty of the National Labor Relations Board to consider the conduct of the employees of respondent company for the purpose of determining whether or not the request for collective bargaining was made in good faith; for it would not seem that under even the strict provisions of the act that an employer could be charged with unfair labor practices for refusing to bargain collectively with his employees, if the facts disclosed that the employees were not seeking collective bargaining in a good faith effort to adjust labor disputes. Also, since the order of the Board did not provide for back pay, it is a reasonable inference that the Labor Board attributed the interruption in employment, in part at least, to improper conduct of the striking employees.

In view of the recent decisions of the Supreme Court defining the power of the National Labor Relations Board under the act, I am of the opinion that the law is with the petitioner, and that this Court should grant the petition for enforcement of the order of the Board,

[7] See note 2, supra.

[8] Title 29 U.S.C.A. § 152 (9):

"When used in sections 151 to 166 of this title * * *.

"(9) The term 'labor dispute' includes any controversy concerning terms, tenure or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether the disputants stand in the proximate relation of employer and employee."

[9] Title 29 U.S.C.A. § 152 (3).

[10] Title 29 U.S.C.A. § 160 (c).