This action is brought by the plaintiff against his employer, The Turner and Seymour Manufacturing Company, for payment to him of certain insurance benefits alleged to be due him under a collective bargaining contract. The plaintiff seeks also, in the alternative, similar, but not duplicate, payment from the defendant insurer, The Liberty Mutual Insurance Company, hereinafter referred to as the insurance carrier.
The plaintiff is a member of the Torrington Foundry Workers Local No. 699, also known as No. 1699, Progressive Metalworkers Council, Congress of Industrial Organizations, which is hereinafter referred to as the union. For the benefit of the employees in the bargaining unit of the company, the union, which was the exclusive bargaining agent for said bargaining unit, entered into a collective bargaining agreement with the company. It *Page 194 
is marked plaintiff's exhibit A, and is hereinafter referred to as the employment agreement. This agreement was for a minimum two-year term and was dated October 31, 1950. It was stipulated by the parties to this action that the plaintiff was a full-time employee of the company and a member of the bargaining unit. On November 1, 1950, the company entered into an insurance contract with the insurance carrier for a group disability policy with riders, plaintiff's exhibit C, hereinafter referred to as the policy. Employees were given insurance certificates, and they completed enrollment cards similar to that attached to plaintiff's exhibit B. Exhibit B is a certificate under the group disability policy issued to the company with enrollment and record card.
The plaintiff with other employees in the bargaining unit went on strike on January 16, 1952. While this strike was in progress and on April 5, 1952, through a nonoccupational accident, the plaintiff suffered an injury. This resulted in a disability which was stipulated by the parties to this action to have been outside the disabilities excluded by the coverage rider serial No. 1 of the policy, and within the disabilities described in condition No. 1, paragraph No. 1, of the policy. Employees were called back to work subsequent to the execution of an agreement to return to work, plaintiff's exhibit D. This is a supplemental agreement between the company and the union, concluded on July 5, 1952. The plaintiff, who was disabled by his accidental injury, did not return to work until August 19, 1952. It was further stipulated that the company knew of the plaintiff's accident within one week after it occurred. A short time after leaving the hospital, the plaintiff went to the company, spoke with Mr. Mayhew, the company's personnel manager, about disability benefits, and, further, about the filing of a claim with the *Page 195 
insurance carrier on a form, plaintiff's exhibit F. This is a copy of "report of employee group claim for information from employee, employer and physician," and is hereinafter referred to as a report of claim. The forms were prescribed and supplied by the insurance carrier, distributed by the company, and sometimes prepared in part by Mr. Mayhew. The company refused to give the plaintiff a report of claim. It denied his eligibility under the policy for the reason, as advanced by the company, that the plaintiff was out on strike when the non-occupational accident which caused his injury occurred.
It was further stipulated that no notice of termination of employment was sent to the plaintiff by the company and no notice of termination of the plaintiff's coverage under the policy was given to the plaintiff by the company or the insurance carrier. Likewise, it is established that no disability insurance benefits were paid to the plaintiff by either defendant. During the period of his disability, the plaintiff received Connecticut medical service and blue cross benefits provided for and paid for by the company. The company advised all employees in connection with these items, inter alia, as is more fully set out in a notice to employees and their families, plaintiff's exhibit E. The notice was published in the Torrington Register, a daily newspaper, under date of February 1, 1952.
The policy was issued to the company at its request, effective as of November 1, 1950. Employees were included and removed from coverage under the policy by act and direction of the company. The simple expedient used was for the company to execute and forward to the defendant insurance carrier monthly reports, as shown in exhibits 1 and 2. Evidence established that these reports were the basis for billing and that the company paid for the coverage *Page 196 
on the basis of the number of employees reported times the unit rate, subject to calculated adjustments and audit.
The plaintiff makes claim that the company is liable for a breach of the employment agreement, and that the insurance carrier is responsible under the policy because of the failure to pay to the plaintiff disability benefits totaling $475, calculated at $25 per week for nineteen weeks.
Briefs of each counsel have been helpful.
The position of the defendant company is that its obligation, if any, with respect to plaintiff's instant demands exists only by reason of the employment agreement; further, that the instrument did not provide for disability benefits as to accidents to strikers or to a person who was absent because of a strike and not because of an injury. The company also claims to have performed its obligations under the employment agreement as to disability benefits by obtaining and continuing the group insurance policy with the insurance carrier. As to the liability of the insurance carrier, the company claims that this was in no way affected by the amount of premiums paid by it during the strike or until the return to work of all the strikers, nor by the omission of any strikers from reports of employees furnished by the company to the insurance carrier.
There can be no quarrel with the company's position relative to the source of its obligations involved. No need exists to recite here more than two excerpts from the employment agreement. On page 3 thereof, in the fashion of a preamble, we find: "PURPOSE OF AGREEMENT. It is the intent and purpose of the parties hereto to set forth herein the basic agreement to promote and improve harmonious industrial and economic relationships between the employees *Page 197 
and the management of the Company, and covering rates of pay, hours of work, and other conditions of employment to be observed by both parties. It shall be the policy of the Company not to discriminate against any employee for union membership, or because of race, creed, color, sex, or national origin. The Union agrees that neither it nor its officers or members will intimidate or coerce employees into membership in the Union."
On pages 30, 31, and 32, we find: "INSURANCE. The Company will provide for its employees the following insurance benefits: (a) Effective December 1, 1950, hospitalization benefits for the individual employee and his dependents as defined in the current Standard Plan of the Connecticut Blue Cross. (b) Effective December 1, 1950, surgical benefits for the individual employees and his dependents according to the current surgical plan of Connecticut Medical Service. (c) Effective November 1, 1950, weekly sickness and accident benefit in the amount of $17.50 per week for part-time workers, and $25.00 per week for full-time workers. Such benefits will be payable in each unrelated case of non-occupational sickness or accident up to a maximum of twenty-six (26) weeks in each case. Benefits will begin on the first day of absence due to an accident and on the eighth day of absence due to sickness. This plan will also provide maternity benefits of six (6) weeks for female employees. (d) Effective November 1, 1950, life insurance in the amount of one thousand dollars ($1,000.00) which shall be payable for death from any cause, but in the amount of two thousand dollars ($2,000.00) if death is due to a non-occupational accident. Other benefits will be payable for non-occupational dismemberment, in accordance with a schedule of such benefits which will be provided for each employee. (e) The Company will not be obliged to involve itself, in any way, in any dispute over *Page 198 
claims for benefits made by employees under the above insurance plan. Such matters shall be resolved between the employee and the insurance carrier and no matter relating to this section shall be subject to either the grievance or arbitration procedures provided for in this contract."
The company claims that for several reasons it is not liable under the employment agreement, subtitle "Insurance," paragraph (c). It asserts that the imposition of liability would be contrary to what it conceives to be the basis for nonoccupational coverage. It claims that the plaintiff's absence because of the strike was not due to an accident or injury, and that the word "workers" as contained in paragraph (c) of the insurance portion of the employment agreement means, in effect, "active employees" rather than just "employees."
In order to facilitate a discussion of these claims, some of the underlying truths, however elemental, in the employer-employee relationship must be examined. Since group insurance is often used by an employer to cover himself for his voluntarily assumed burden of disability benefits for his employees, the following is pertinent: "From the employer's point of view, the advantages of group insurance are virtually the same as those responsible for all other forms of voluntary welfare work in industry. Group insurance is expected to improve relations between capital and labor. It is supposed to create a feeling of loyalty to the employer — not only on the part of the employee but to an even greater extent on the part of the latter's family — to reduce labor turnover and both directly and indirectly to increase efficiency of labor. How far these expected results have actually materialized it is of course very difficult to show. But at any rate the cost to the employer is comparatively insignificant, and it grows smaller as the contributory plans gain *Page 199 
on popularity...." 7 Encyclopaedia of Social Sciences, pp. 182, 185.
The company's position as to the strike and the plaintiff's part therein, and its claim that this, rather than the accidental injury, accounted for the plaintiff's absence, overlook the legal concept of a "strike." True it is, the company's position does not offend an established precedent in our state on the point involved. There is a dearth of law elsewhere on the particular question.
The early conception of a strike was that it was "a conspiracy." 83 C.J.S. 523. Any talk of it being peaceable or legal was considered as idle chatter.Farmers' Loan Trust Co. v. Northern Pac. R. Co.,
60 F. 803, 821, 822, 25 L.R.A. 414. This thinking has long since given way to the acceptance of the strike as an indispensable prerogative of labor in its struggle with capital. Motion Picture MachineProjectionists Protective Union v. Rialto TheatreCo., 25 Del. Ch. 347.
There is no claim or indication in the instant case of any illegality. Exhibit D included an agreement for resumption of work and a settlement of the demands of the union. This arrangement was to be effective only upon the termination of the then existing strike. A strike is in its essence "a cessation of work by a body of workmen as a means of enforcing compliance with demand or demands made upon the Company." 31 Am. Jur. 928, § 191; Sandoval
v. Industrial Commission, 110 Colo. 108. The striking employees retain the status of employees during the work stoppage. 31 Am. Jur. 928, § 191, n. 11; National Labor Relations Board v. ColumbianEnameling Stamping Co., 96 F.2d 948, 952; Sammons
v. Hotel Restaurant Employees Local Union,
93 N.E.2d 301, 302 (C.P. Ohio). There has been no evidence in this case to indicate that the plaintiff *Page 200 
was other than a striking employee. In labor relations it is considered to be an integral part of a legal strike that strikers be absent from their work. The power of employees to absent themselves from work is essential to labor's maintenance of its bargaining position. The fact that the plaintiff did a legal and necessary thing by absenting himself from work should not in and of itself create the basis for a penalty and operate to deprive him of certain rights. No claim of absence because of the strike, rather than absence from work because of the accident, could be advanced for the period from July 5, 1952, when the strike was settled, until August 19, 1952, when the plaintiff returned to work.
The quoted words from the purpose of agreement and insurance portions of the employment agreement would be reduced to meaningless language and doggerel if "worker" is to be considered as something apart and disassociated from "employee." An employee is one who works or is in the service of another and whose work as to extent and manner is directed by that other. 35 Am. Jur. 445, §§ 2, 3. Webster defines an employee as one who works for wages or salary in the service of another. Webster's New International Dictionary (2d Ed.). In the word "worker," as Webster points out, we are dealing with one noun formed from another noun. Such is the power of the suffix "er." The meaning then becomes "one who has to do with work." "A workman is defined by Webster to be a man employed in labor, whether in tillage or manufacture; a worker; hence, especially, a skillful artificer or laborer. The Century Dictionary gives the definition as a man who is employed in menial labor, whether skilled or unskilled;a worker; a toiler; specifically, an artificer; a mechanic or artisan; a handicraftsman. Bouvier defines a `workman' generally as `one who labors; one who is employed in some business for another....'" *Page 201 
45 Words Phrases (Perm. Ed.) 510 (italics supplied).
By going out on strike, the employee did not lose his status, he did not cease to exist as such; he became a striking employee. To claim a decisive difference between "employee" and "worker" as used in the employment agreement is not only to overlook the stated purposes of the agreement but also to deny the common and accepted usage of words. The word "worker" is not indefinite in meaning. It includes forms of physical and mental exertion or both. It is a classification which embraces certain types or groups of employees. 31 Am. Jur. 834 § 2, 835 § 3.
As to the function of the worker, it has been written: "The study of the worker and his goals and methods embraces his functions in many aspects, e.g., as a producer of goods and services, as a citizen, as a consumer. The economist's primary interest may lie in evaluating the productive aspect, especially from the point of view of a full employment economy: the political scientist may view labor organizations as one of the numerous pressure groups in the American tug-of-war centering in Washington, the sociologist may see the worker as a human being caught in a congeries of frustrations, complexes, and urges." Forkosch, Labor Law, p. 1. From this there would seem to be no difference in the action, activities, office or operation between a "worker" and an "employee." "The word `worker' has a wider range than the word `employee.' It is the genus of which `employee' is a species. It includes wage earners who are unemployed and employed wage earners in their relation to their own employer or in their relation to other employers. It includes also persons who have just come into the labor market and are seeking employment for *Page 202 
the first time, such as young men just out of school." Restatement, 4 Torts § 776, comment a.
If, instead of "part-time workers" and "full-time workers," in the language quoted from paragraph (c) of the insurance portion of the employment agreement, it was originally agreed and intended to include in the employment agreement only part-time and full-time active workers or, part-time and full-time workers exclusive of those who are on strike, the agreement might have so stated in clear and unequivocal language. It is the court's conclusion that no such meaning was agreed upon, intended, or recited by the parties to the agreement.
The liability of the company to the plaintiff did not cease when it arranged for the policy with the insurance carrier. The company was pledged to provide continuous insurance benefits for two years. Paragraph (e) of the insurance portion of the employment agreement does not relieve the company. Neither cancellation by the insurance carrier, nor interim coverage by the company, nor possible failure or discontinuance of an insurance carrier, could excuse the company from its primary obligation. There was, therefore, no such action on the part of the company, in obtaining the policy, which could be considered full and final performance of its obligations under the insurance portion of the employment agreement.
It cannot be successfully argued that the liability of the insurance carrier under the policy was not affected by the company's reduction of the number of employees covered when, for instance, on February 1, 1952, it reported less employees and excluded from the protection of the policy the group which was on strike. The company suspended coverage of the strikers by the insurance carrier. Actually, the company bought coverage for fewer people and *Page 203 
thereby saved itself the difference in premium cost. It must pay an established unit rate and can control its total expenditure only by the number of employees it "orders" covered from month to month under the policy.
In this respect, there is precedent for holding that the company committed such an act as would work to relieve the insurance carrier. Degnan v. MetropolitanLife Ins. Co., 178 Misc. 312. In that case, the failure to pay premiums and the notice of cancellation given by the employer to the insurance carrier were the basis upon which the majority of the court decided that the insurance carrier was free from liability. In the case at bar, as has already been said, the premiums were "cut back" by the company and the exclusion of the strikers was tantamount, at least, to a temporary partial suspension or cancellation of the policy as it applied to the striking employees, including the plaintiff.
Where the terms and conditions of a group insurance policy require the employer to certify to the insurer the names of those insured, and to pay premiums monthly for each employee insured, the failure to include an employee in the list insured and to pay premiums on the insurance for him precludes recovery against the insurer for such employee.Magee v. Equitable Life Assurance Co.,62 N.D. 614, 85 A.L.R. 1457. Though the evidence in the case at bar does not establish that the insurance carrier actually required the employer to certify the names of those insured monthly, the exclusion of the striking group in the monthly reports was as effective an elimination of the plaintiff from the coverage as if he had been excluded by name. This, together with the failure of the company to pay premiums on the insurance for the plaintiff, precludes recovery against the insurance carrier. This finding as to the position of the insurance carrier *Page 204 
obviates the necessity of dealing with the question whether the company was the insurance carrier's agent in connection with notice of the plaintiff's accidental injury or whether the plaintiff failed to comply with condition 5 of the policy.
The issues are found for the plaintiff against the defendant company only, and for the defendant insurance carrier against the plaintiff.
 Judgment may enter for the plaintiff to recover from the defendant The Turner and Seymour Manufacturing Company the sum of $475 with interest to date from August 19, 1952, amounting to $64.75, and taxable costs. Judgment may enter for the defendant The Liberty Mutual Insurance Company.