**Marlys Ann KORZINEK, Plaintiff,**

v.

**POSTAL LIFE INSURANCE COMPANY, Defendant.**

United States District Court
S. D. New York.
Jan. 7, 1964.

Daniel P. A. Sweeney, New York City, for plaintiff, Joseph F. Walsh, Newark, N. J., of counsel.

Winthrop, Stimson, Putnam & Roberts, New York City, for defendant, Stephen A. Weiner, New York City, of counsel.

FREDERICK van PELT BRYAN, District Judge:

Plaintiff, the widow and named beneficiary of Clarence E. Korzinek, sues to recover $20,000 in additional insurance benefits under two group insurance policies issued by defendant Postal Life Insurance Company (Postal) to Selinger Textile Corporation (Selinger) and its subsidiaries which covered her late husband as an employee of Selinger Pajama Fabrics, Inc., one of the subsidiaries. The case was tried before me without a jury. Jurisdiction is based on diversity of citizenship and this court has jurisdiction under 28 U.S.C. § 1332.

The insurance policies involved here were issued in New York by a New York insurance company to Selinger which has its principal place of business in New York City. Clearly, therefore, New York law controls the rights of the parties under these policies.

The evidence adduced on the trial established and I find the facts to be as follows:

Clarence Korzinek, plaintiff's husband, died on May 28, 1960 while in the employ of Selinger. He was employed as a designer by Selinger Pajama Fabrics, Inc., a subsidiary of Selinger, in March of 1959. In October or November, 1959, Disler, comptroller for Selinger and its subsidiaries, notified Postal that, effective October 1, 1959, Korzinek was to be covered under Selinger's group policies in the Postal in the class of general employees for $5,000. Korzinek, in the latter part of October, also signed and submitted an "Enrollment Card" with pertinent personal information and designation of beneficiary. Postal received no other notice concerning Korzinek until after his death, at which time Disler, the Selinger comptroller requested payment of $5,000 under each policy.

Sometime toward the end of 1959 it was decided to combine the art departments of two Selinger subsidiaries, Selinger Design Corp. (Design) and Selinger Pajama Fabrics, Inc. (Pajama) to further closer cooperation between them and for reasons of economy. Korzinek was thereafter appointed head of the combined departments by Partnoy, head stylist of Selinger and president of Design, but he remained on the payroll of Pajama.

When deceased took over his new job he received a salary increase in excess of the normal periodic increase to which he was then entitled and continued at this salary until his death. Cohen, president of Pajama, testified that Korzinek was considered a department head. Partnoy, who appointed Korzinek to his post, testified that "Head of Studio Department" was a formal title although the company had no formal table of organization, while Disler, the comptroller for all the Selinger companies, testified that there were no formal titles in the organization. Nevertheless, it is undisputed that Korzinek's duties included ac-

·tual designing, ordering of equipment, assignment of work, screening new personnel and recommending salary increases. When he took over deceased was also given his own office just off the studio area. Furthermore, he replaced von Metzgar who was considered a department head and was carried in Postal's register as such.

Some time after taking over his new job Korzinek asked Disler if his insurance coverage would be increased. Disler told him it would not be since he, Disler, considered the new department an experiment and since he felt that there should be a six months waiting period, similar to the waiting period of new employees for .initial eligibility, before he reported any increased coverage. Both Cohen and Partnoy testified, however, that the combined department was considered permanent or as permanent as any innovation could be in an industry in which change is the rule. Disler was the person charged with administration of the policies. He testified that the decision to institute a six month waiting period was his own idea and was made without reference to the provisions of the policy. Disler also testified that had Korzinek continued in the same position to the end of six months, he would have submitted his name for increased coverage.

In the light of this evidence I found at the trial that Korzinek was in fact a department head at the time of his death and from the date of his appointment on or about January 1, 1960 and that he was considered as such by his employer.

Despite this finding Postal asserts that it is nevertheless not liable to Korzinek's beneficiary for the insurance benefits provided by the policy for "Department Heads," on two grounds: first, that it received no premiums for additional insurance on Korzinek; and second, that it was never notified to increase the insurance in force on Korzinek.

■ These defenses call for a construction of the insurance contracts entered into by Selinger and Postal. Al-

though these policies must be considered as a whole, Schloss v. Fidelity Mutual Life Insurance Co., 193 Misc. 121, 122, 80 N.Y.S.2d 610 (Sup.Ct.1948), there are sections which are particularly pertinent here.

As indicated, Postal issued two master policies to Selinger. Group Policy No. 298G (Plaintiff's Exhibit 1) was a policy of straight life insurance, and No. 298A (Plaintiff's Exhibit 2) was an accidental death and dismemberment policy. As the relevant clauses of these policies are identical or substantially so, and the parties concede that if liability attaches under one policy, it attaches also under the other, all references to the policies and to section numbers apply specifically to the life insurance policy No. 298G (Plaintiff's Exhibit 1), unless otherwise indicated.

The original issue date of both policies was November 17, 1958. Since the policies were non-contributory, coverage was not elective with the employees. However, the policies covered only full time employees and section 2, in relevant part, provided that all such employees "shall be eligible for insurance hereunder on the day immediately following the date of completion of six months of continuous employment." Section 3, captioned "Effective Dates of Insurance" provides: "The Insurance hereunder on any Employee shall become effective on the date of his eligibility, provided he is actively at work on the date of his eligibility * * *." Thus, by its terms, the policy covered all full-time employees with six months service in accordance with New York Insurance Law, § 204(1) (a) and § 221(2) (a).

Although Section 5 "Cessation of Insurance" contains specific provision for notice to Postal of termination of employment in order to discontinue coverage of employees away from active work because of sickness, injury, layoff, temporary leave of absence, etc., its basic provision is that insurance "on any Employee insured hereunder shall automatically cease on the date of the termination of his employment."

Plaintiff relies heavily on Section 6 of the policy. This section is captioned "Amount of Insurance" and provides:

"The amount of insurance hereunder on any Employee shall be in accordance with the schedule set forth below and any increase or decrease in the amount of such insurance, in accordance with said schedule, shall become effective, provided the Employee is then actively at work on the date of change in the Employee's class; if such Employee is not then actively at work, any increase in the amount of insurance shall become effective on the next following day on which he is actively at work."

The relevant part of the schedule of insurance specifies coverage of $15,000 for "Department Heads, Assistant Department Heads, and Assistant Divisional Sales Managers" and $5,000 for "All other Employees."

The "Insuring Clause," Section 7, then provides that upon satisfactory proof that an Employee insured by the policy died while an Employee of the policyholder, "the Insurance Company shall pay, subject to the terms hereof, to the Beneficiary of record of such Employee, the amount of Life Insurance, if any, in force hereunder on account of such Employee, in accordance with Section 6 hereof at the date of his death."

Section 10(A) provides that the Employer's application (which was not introduced in evidence by either party) and the policy constitute the entire contract between the parties. Section 11 then declares that "No change in this Policy shall be valid unless approved by an executive officer of the Insurance Company and evidenced by indorsement hereon, or by amendment hereto signed by the Employer and by the Insurance Company."

Pursuant to New York Insurance Law §§ 161(1) (d) and 162(1) (f), Section 12 provides for the issuance of an individual certificate to each covered employee stating the insurance protection to which he is entitled and the name of the beneficiary. In the certificates issued to plaintiff's husband the following sentence was typed in: "The Amount of Insurance is subject to change because of changes in the individual's occupational classification in accordance with the provisions of the Group Policy."

Defendant, on the other hand, relies most heavily on Section 15 which provides:

"REGISTER.—The Insurance Company shall keep a Register which shall show at all times the names of all Employees insured hereunder and the amount of insurance in force on each of such Employees, together with the date when any insurance became effective and the effective date of any increase or decrease in amount of insurance.

"Clerical errors and omissions shall not deprive Employees of insurance hereunder; nor shall failure to record any termination of insurance of an Employee be construed as involving or affecting the continuation of such insurance beyond the date of termination as determined in accordance with the provision hereof entitled CESSATION OF INSURANCE."

It may be noted here that the policy is silent as to the method of compiling this register and this is the only reference to it, but that it specifically provides that clerical errors and omissions shall not deprive employees of insurance to which they would be otherwise entitled.

Finally, Section 16, "DUE DATE, COMPUTATION AND PAYMENT OF PREMIUMS" provides that premiums are due on the seventeenth day of each calendar month. Postal was to compute an average monthly premium rate per $1,000 of insurance in force as of the date of issue. This rate of premium was subject to recomputation only on the renewal (anniversary) date of the policies, or in the case of the straight life policy, whenever terms of the policy were changed. The actual amount of any premium

payment was to be determined by applying the average monthly premium rate then in effect to each $1,000 of insurance then in force on all Employees, "subject, however, to premium adjustments, if any."

In the course of their dealings under these policies, Postal and Selinger adopted a monthly reporting procedure. Initially each new eligible filed an "Enrollment Card" which specified the amount of insurance and the beneficiary. This card was placed in the "Register" referred to in the policy and constituted the entire record of coverage of an individual in that "Register." (Defendant's Exhibit G). In addition, Postal supplied forms to Selinger on which it was to report changes in coverage.

The face of the report forms do not indicate how often they had to be filed. Since, as I will mention later, the premium was not computed monthly, there is no inherent reason why monthly, as opposed to quarterly, reports should be required. Printed on the back of the form, however, are "Suggestions Regarding Reports of Changes in Group Insurance." The second "suggestion" provides:

"It is best to send in one report each month, even though there sometimes may be no changes to report. If there are no changes, write "No Changes" across the face of the report, and send it in, dated and signed as usual."

Both Disler and Burstein, the head of Postal's Group Life Department, testified that it was the practice to submit these reports monthly but that Selinger, and other policyholders, would sometimes fall behind a month or two.

Other "suggestions" on the back of the report form provide:

"5. For increases and decreases the effective date of change is the date of change in salary or other classification * * *."

"7. When you prepare the change report try to make sure that every change which has not been previously reported is definitely reported currently * * *."

"8. All the reported changes during the year will be incorporated in a premium adjustment statement with the first premium notice for the next policy year."

Burstein testified that the practice of Postal in billing premiums was in accord with this last "suggestion." In practice, the premium rate was computed at or around the anniversary date of the policy and the amount of monthly premium actually paid for the next eleven months was based on the insurance in force when the computation was made. At the end of the policy year, all changes reported during the year were compiled and a determination made of what premium had actually been due each month during the preceding year by the terms of the policy. On the next premium notice, the appropriate adjustment was made. The evidence shows that Postal made no payroll audit but relied entirely on the reports themselves or as they were reflected in the "Register" when it computed the adjusted premium. As a result of this procedure, Postal had received no premium payments specifically attributable to Korzinek at the time of his death. No premium adjustment of any kind was made with respect to Korzinek until the statement for the period ending November 16, 1960, long after his death, because the initial report of his eligibility arrived after the computations for the policy year beginning November 17, 1959 had been completed.

 The first defense raised by Postal may be disposed of quickly. Although non-payment of premium usually releases an insurance company from liability under a policy, it is no defense here. In this case Postal did in fact receive from Selinger monthly the premium which it expected and to which it was entitled, as a condition of keeping the master policies in force. The amount of the monthly payments in no way reflected the periodic changes in coverage. It should be noted that under the practice adopted by the parties, Postal had received no

premiums at all attributable to Korzinek prior to the date of his death. Yet, Postal admits liability for $5,000 under each policy.

The policies provided that the actual amount of a monthly premium due was to be "determined" by applying the premium rate to the amount of insurance in force on the premium due date. The parties interpreted this clause to mean that the "determination" was to be made annually and adjustment made each November so that Postal could collect additional premiums or refund unearned premiums. The final premium, therefore, was based on the previous year's experience of Selinger with its employees. This was a reasonable interpretation of the clause and in no way changed the terms of the policies.

■ Any rights which Korzinek had under the policies, vested absolutely on the date of his death, the event insured against, and subsequent actions of his employer and of Postal cannot defeat those rights. 1 Appleman, Insurance Law & Practice, § 46. See also Ambrose v. Metropolitan Life Ins. Co., 18 N.J. Misc. 42, 10 A.2d 479, 481 (1939) and Liner v. Travelers Ins. Co., 50 Ga.App. 643, 180 S.E. 383, 385 (1935).

It is clear, therefore, that Postal is not protected from additional liability because, in November, 1960, more than five months after the death of Korzinek, it billed Selinger and received premiums for coverage of Korzinek at only $5,000 under each policy.

The defense of lack of notice of change in amount of coverage raises questions which have not been previously litigated. The policies are, in terms, silent as to what notice is required and whether notice is a condition to an increase or decrease in the amount of coverage.

Previous cases in New York and elsewhere have indeed established that the insurer has the right to rely on notice it receives from the policyholder with respect to coverage. But those cases involved affirmative notices to cancel and notices implicit in the non-payment of premium attributable to specific employees. Schwartz v. Mutual Benefit Life Ins. Co., 28 Misc.2d 367, 212 N.Y.S.2d 359, aff'd, 14 App.Div.2d 754, 218 N.Y. S.2d 526 (1961) (actual notice and non-payment of premium); Degnan v. Metropolitan Life Ins. Co., 178 Misc. 312, 34 N.Y.S.2d 238 (1942) (actual notice and non-payment of premium); Simsaki v. Equitable Life Assur. Soc., 154 Misc. 533, 277 N.Y.S. 424 (1935) (actual notice and non-payment of premium); Tedesco v. Turner & Seymour Manufacturing Co., 19 Conn.Supp. 192, 110 A.2d 650 (1954); Collins v. Metropolitan Life Ins. Co., 163 Va. 833, 178 S.E. 40 (1935) (name dropped from required monthly reports with proportionate reduction in monthly premium); Hanna v. Mt. Vernon Life Ins. Co. of N. Y., 260 F.2d 244 (8 Cir. 1958) (premiums paid only for names in required report and policy provided automatic cancellation of insurance on an individual employee if premiums on his behalf not paid). In this case defendant was properly notified that Korzinek was to be included in the group but it received no notice of a change in employment classification between January and May, 1960. During this period, moreover, the premiums paid were for the purpose of keeping the group policy in force and reflected no increases or decreases in insurance in force since the time of computation at or around the last renewal date.

■ It is essential to defendant's case to establish that the coverage shown in its Register establishes the limit of its liability and that failure to notify it was not within the clerical errors and omissions exception of the policy. But defendant has the additional burden of establishing that this is the only reasonable interpretation of the policy for if the policy is capable with equal reason of an interpretation favorable to plaintiff, the ambiguity must be resolved in her favor. Hartol Products Corp. v. Prudential Insurance Co., 290 N.Y. 44, 49, 47 N.E.2d 687 (1943); Vito v. General Mutual Insurance Co., 15 A.D.2d 289, 223 N.Y.S.2d 431 (3d Dept.1962).

Briefly, defendant's position is that the only reasonable interpretation which can be placed upon the clause providing for it to maintain a Register which would show at all times the names of insured employees and the amount of insurance in force on each is that failure to record a change on the Register precludes coverage. If behind this clause was an intention to create a condition of coverage, its expression in the policy falls far short of achieving such a purpose.

■ A condition must be spelled out with sufficient precision that men of average intelligence reading the policy would ascribe to it the meaning urged by the insurer here. Bronx Savings Bank v. Weigandt, 1 N.Y.2d 545, 551, 154 N.Y.S.2d 878, 136 N.E.2d 848, 60 A.L.R. 2d 1422 (1956); Morgan v. Greater New York Taxpayers Mutual Insurance Assoc., 305 N.Y. 243, 248, 112 N.E.2d 273 (1953); Augusta v. John Hancock Mutual Life Insurance Co., 11 Misc.2d 111, 170 N.Y.S.2d 908 (Mun.Ct., 1958). This is especially so where the condition is essentially contrary to and limits the group feature which by treating the various insured employees as an entity provides the flexibility needed to accommodate the normal periodic adjustments within a business organization. See 1 Appleman, op. cit. supra, § 41.

■ Not only does the Register clause fail to spell out that notice is a condition precedent to coverage or to an increase in coverage, but the New York statutes, the contents of other clauses, the general set-up of the policies, and the practices of the parties under the policies, preclude the implication of any such condition.

■ The statutes of the State of New York form the background against which these policies were drafted. Although not decisive of the case before me, they do suggest a state policy against conditions precedent to coverage of individuals within the group. The relevant New York statute provides that every group policy must contain, in substance, a provision or provisions more favorable to the insured that "all new employees of the employer * * * in the groups or classes eligible for such insurance must be added to such groups or classes for which they are respectively eligible." New York Insurance Law, §§ 161(1) (g), 162(1) (c). In addition, it is provided that a non-contributory policy must cover all employees, or all of any class of employees "determined by conditions pertaining to the employment * * * for amounts of insurance on each person insured based upon some plan which will preclude individual selection." New York Insurance Law, §§ 204(1) (a), 221 (2) (a).

Added to this statutory base is the fact that the clauses dealing specifically with the effective dates of insurance and the amounts of insurance do not refer to notice or to the Register but only to dates of eligibility and change of job classification. Finally, the "Insuring Clause" providing for payment upon proof of loss refers not to the Register but specifically to the class of the employee according to the schedule of insurance provided in Section 6. All these factors indicate that the parties contemplated that for those within the group changes in job-classification would mean automatic increases or decreases in insurance coverage.

Furthermore, the Register provision is not contained in that part of the policy defining eligibility, effective dates of coverage, and the like, but, in both policies, appears immediately before the premium computation clause, indicating its relation thereto. Indeed, the record shows that that was its main purpose. That being so, it might quite logically be implied that notice of change would be timely at any time until the adjustment of premium was made at the end of the policy year. The only other apparent purpose of the Register was to record beneficiaries pursuant to Section 13 of the policy regulating "CHANGE OF BENEFICIARY." It should be noted that the physical contents of the Register consisted solely of the "Enrollment Cards" on the back of which were spaces

for indicating the amount of insurance and the effective date.

The policy nowhere indicates what method was to be used to compile subsequent changes on these "Enrollment Cards." Although it would have been more accurate to have used a payroll audit, Postal chose to rely on reports from the policyholder. In view of Section 11 of the policy providing that the terms of the policy could be changed only by proper indorsement, adoption of this reporting procedure could not impose a condition not stated in the policy itself. See New York Insurance Law § 161(1) (b).

Moreover, the evidence establishes that although it expected monthly reports, Postal did not require one to be filed each month and in fact Selinger and the other policyholders sometimes fell behind. In addition, the "Suggestions" themselves for reporting indicate that increases and decreases were effective on the date of change of job-classification rather than on the date of the report. The report form nowhere indicates that it must be limited to changes within the previous month or even since the last report. Thus, the Register at any time offered only prima facie evidence of the amount of insurance then in force.

 For all the above mentioned reasons I find no ambiguity in the provisions of these policies. They are silent on the question of notice. But conditions precedent must be clearly expressed or must arise by inescapable inference from the actual terms of the policy. The insurer is only entitled to have the policy enforced as written. Bronx Savings Bank v. Weigandt, supra, 1 N.Y.2d at 551, 154 N.Y.S.2d at 882, 136 N.E.2d at 851; McGrail v. Equitable Life Assurance Society, 292 N.Y. 419, 424–425, 55 N.E. 2d 483 (1944); Augusta v. John Hancock Ins. Co., supra, 11 Misc.2d at 118, 170 N.Y.S.2d at 916. As written it expressly provides that the amount of insurance payable is in accordance with the schedule in Section 6 and that any increase or decrease shall be effective when the employee is actively engaged at work on the date of change in his class. Korzinek was actively at work at the time of his death and had been for many months. The insurer is clearly bound by this express provision of its policy.

Moreover, the practice of the parties pursuant to these policies confirms the fact that notice was not considered a prerequisite to an increase in coverage.

Plaintiff is entitled to judgment against the defendant for the full amount due to a head of a department under such policies together with interest from the date of death. Judgment will be entered in plaintiff's favor accordingly.

The foregoing opinion constitutes my findings of fact and conclusions of law in this case pursuant to Rule 52(a), F.R. C.P.

It is so ordered.